OPINION
{¶ 1} Defendant-appellant Dominic Pannunzio, D.D.S. appeals from the judgment entered against him after a jury trial in the Mahoning County Common Pleas Court on the malpractice claim of plaintiff-appellee Bryan Scibelli. Appellant raises numerous issues involving judicial bias, discovery, testimony on a stipulated issue, testimony from a treatise, the relevance of a slide show, limitations on defense expert testimony, closing arguments, cumulative error and prejudgment interest. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF THE CASE {¶ 2} On October 3, 1998, twenty-three-year-old Bryan Scibelli first visited Dr. Pannunzio with complaints of a loose wisdom tooth, jaw pain and swelling. A periapical x-ray was performed, which provided a limited view of a small area. A black spot in the jawbone adjacent to the root of the tooth was visible. (Tr. 693). It was established that x-rays typically show bone looking whitish gray whereas a black spot can indicate bone destruction. The limited view of the periapical x-ray did not show the entire apex of the tooth or the entire area of the black spot as would a panoramic (or Panorex) x-ray, which shows the entire jaw and all teeth. Dr. Pannunzio diagnosed an infection, prescribed an antibiotic and recommended extraction. (Tr. 358-359). Mr. Scibelli returned five days later for the extraction. Another periapical x-ray was performed, again showing part of the black spot in the jawbone. (Tr. 696).
 {¶ 3} On January 9, 1999, Mr. Scibelli returned to Dr. Pannunzio's office for a routine cleaning. A panoramic x-ray was performed. It was stated that a black spot the size of a quarter was discussed with Mr. Scibelli and diagnosed as residual infection. (Tr. 371-372, 701-702). A tumor was not diagnosed, and Mr. Scibelli was not referred for treatment or further diagnostics.
 {¶ 4} At the end of March 1999, Mr. Scibelli called the office complaining of tingling in his lower lip and facial asymmetry. (Tr. 375-377). Dr. Pannunzio called in an antibiotic prescription. (Tr. 378). Mr. Scibelli was evaluated on April 6 and April 13, and significant facial swelling was apparent. (Tr. 379). He was continued on antibiotic treatment. (Tr. 382).
 {¶ 5} On April 20, 1999, another panoramic x-ray was performed, which showed a large mandibular mass. At this time, Dr. Pannunzio referred Mr. Scibelli to an oral surgeon. The mass was diagnosed as an odontogenic myxoma. Although considered benign, it had destroyed the majority of Mr. Scibelli's right jawbone. The tumor was surgically removed. Nine teeth on the lower right side of his mouth were lost as a result of the disintegration of bone and the surgery. And, a new jawbone had to be created from a portion of Mr. Scibelli's fibia. He has also required reconstructive plastic surgery and restorative dental procedures. (Tr. 627-642). He complains of facial deformity and scarring, limited use of his jaw with paralysis of the lower right side of his jaw and lost teeth.
 {¶ 6} Mr. Scibelli filed a medical malpractice action against Dr. Pannunzio for failure to timely diagnose the tumor. Dr. Pannunzio admitted breach of the standard of care. On April 29, 2002, a jury trial was held on the issues of proximate cause and damages. The jury returned a defense verdict. Because Dr. Pannunzio's own expert at least agreed that the delayed diagnosis resulted in the loss of an additional one or two teeth as the tumor grew, the trial court granted Mr. Scibelli's Civ.R. 59(A)(6) motion for a new trial on the grounds that the verdict was against the manifest weight of the evidence. Dr. Pannunzio appealed, and this court affirmed the trial court's decision to grant a new trial. Scibelli v. Pannunzio, 7th Dist. No. 02CA175, 2003-Ohio-3488.
 {¶ 7} The second trial began on October 25, 2004. The jury returned a verdict for Mr. Scibelli in the amount of $800,000. Mr. Scibelli then filed a motion for prejudgment interest. On January 27, 2005, a hearing on the matter was held. On July 25, 2005, the court granted prejudgment interest in the amount of $472,458.29.
 {¶ 8} The within appeal followed. Dr. Pannunzio (hereinafter appellant) sets forth eight assignments of error. But first, we must address a procedural problem raised by appellee.
 PROCEDURAL ISSUES {¶ 9} As pointed out by appellee, appellant has violated App.R. 16(A)(5) and (7). App.R. 16(A)(5) specifically provides that the brief shall contain:
 {¶ 10} "A statement of the case briefly describing the nature of the case, the course of proceedings, and the disposition in the court below."
 {¶ 11} App.R. 16(A)(7) then states that the brief shall contain:
 {¶ 12} "An argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."
 {¶ 13} However, the statement of the case here is more than twenty pages long and contains arguments that should be presented under the corresponding assignments of error. The argument section leaves out the arguments set forth in the statement of the case, including any citations to the parts of the record where the alleged errors occurred. As a result of appellant's noncompliance with the Appellate Rules, this court was forced to refer back to the statement of the case and search through its twenty pages to find the corresponding arguments and cites as we address each assignment of error.
 {¶ 14} Appellee asks us to totally disregard various assignments of error where this problem exists. Since reaching the merits of the case outweighs our frustration, we decline to take the remedy suggested by appellee. However, we warn appellant that we shall scan the statement of the case for the correlating arguments relevant to each assignment of error, but there will be no reconsideration if we are perceived to have missed an argument or citation that was not specifically contained under the assignment of error.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 15} In the first assignment of error, appellant contends:
 {¶ 16} "THE TRIAL COURT JUDGE ENGAGED IN JUDICIAL MISCONDUCT THAT CONFIRMED ITS BIAS AND PREJUDICE AGAINST DEFENDANT AND HIS COUNSEL."
 {¶ 17} Appellant alleges that the contents of his assignments of error reflect numerous prejudicial rulings that establish the trial judge was biased. Appellant contends that the judge confirmed her impartiality when she advised that she would be recusing herself. (Tr. 212). Although, she later changed her mind on recusal. (Tr. 229). Appellant also claims that the judge purposely avoided journalizing her pretrial discovery order so they could not appeal. (As we discuss later, however, the discovery order would not have been a final appealable order even if it had been journalized.) Finally, appellant concludes that he was deprived a fair trial due to the court's hostility toward his counsel.
 {¶ 18} Whether there was error and/or prejudice in the rulings appealed in the following assignments of error will be dealt with under those assignments. As to whether those rulings were the manifestation of judicial bias and/or prejudice, that issue was determined pursuant to the Supreme Court's denial of appellant's two Affidavits of Disqualification, one filed prior to trial and one filed after trial but before the prejudgment interest hearing.
 {¶ 19} For instance, in responding to appellant's first Affidavit, the Supreme Court found that the trial judge's decision to disallow new witnesses and her prompting appellee to make a settlement demand for purposes of prejudgment interest did not demonstrate bias. The Court also denied that the judge's derogatory statements about defense counsel's work on the case constituted partiality. Moreover, the Court stated that any sympathies expressed for the plaintiff years ago at the first trial do not establish bias at this time as the time for complaint has passed.
 {¶ 20} In response to appellant's second Affidavit, filed after trial and before the prejudgment interest hearing, the Supreme Court dismissed the allegations of bias that allegedly occurred during the second trial. Some issues discarded include barring appellant from presenting Dr. Carlson's testimony and making disparaging comments about counsel in front of the parties but outside the presence of the jury regarding counsel being late and problematic voir dire. (Tr. 176-210).
 {¶ 21} Thus, most of appellant's claims of bias have already been reviewed and discarded by the Supreme Court (or they could have been presented in the Affidavits filed). The only issue that was not and could not have been raised in an Affidavit was appellant's contention that at the prejudgment interest hearing, the judge implied that her new trial decision in the prior trial was influenced by the jurors' statements made in interviews after the trial. (P.J.I. Tr. 169).
 {¶ 22} After the first trial, the jurors' stated in the presence of the trial court and appellee's counsel that they were unaware they could choose an amount between the two parties demands. Appellant's counsel declined to attend this interview.
 {¶ 23} At the prejudgment interest hearing after the second trial, appellant's counsel was questioning appellee's counsel as to why they thought they deserved a settlement offer since the first trial resulted in a defense verdict. The trial court injected the fact that the jurors were confused in the first trial and maybe that is why appellee believed that the first verdict meant nothing in terms of the propriety of a settlement offer.
 {¶ 24} On questioning by appellant's counsel, the judge specifically rejected counsel's suggestion that her decision to grant a new trial was based on the jurors' post-trial statements. (P.J.I. Tr. 170-171). Rather, she brought up the issue as one of the reasons why a new trial was requested by appellant and to highlight how appellant's counsel should have remained to interview the jurors to gain perspective as to why a prior defense verdict did not immunize them for purposes of prejudgment interest. Thus, the judge refuted appellant's claim. Regardless, the decision to grant a new trial in the first trial is not before this court. Accordingly, we are only concerned with matters which occurred during the second trial.
 {¶ 25} Finally, we point out that the determination that a common pleas court judge should have recused herself or should be disqualified due to bias or prejudice is the exclusive province of the Chief Justice of the Supreme Court or his designee. Statev. Payne, 139 Ohio St.3d 368, 2002-Ohio-5180, ¶ 8 (7th Dist.). The Ohio Supreme Court has reversed an appellate court's judgment that a common pleas court judge had a conflict of interest and was biased. Beer v. Griffith (1978), 54 Ohio St.2d 440. We note the dissent's argument in Beer that the court of appeals could address the issue because judicial bias did not become known to the plaintiff's attorney until oral argument, when the appellate judges informed him that the defendant's counsel was the trial judge's nephew. Still, the majority of the Supreme Court held that the appellate court had no authority to make disqualification rulings or to void judgments on the basis of bias. Id. at 441-442.
 {¶ 26} While it may be true that an appellate court can review criminal jury trials to determine whether a judge's behavior prejudiced or biased the jurors (see, e.g. State v.Wade (1978), 53 Ohio St.2d 182, 188), that line of reasoning does not extend to conduct which was not viewed or experienced by the jury. The fact remains that the appellate court is without jurisdiction to pass upon issues of disqualification or to void a judgment on the basis of a common pleas court's alleged bias or prejudice. Furthermore, where an Affidavit of Disqualification has already been filed, the appellate court cannot review claims of bias previously reviewed by the Chief Justice. Moreover, logic dictates that an appellant should not be permitted to raise claims of bias before the appellate court that could have been, but were not, brought in the affidavit filed in the Supreme Court. For all of the foregoing reasons and the related ones set forth under the following assignments of error, this assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 27} Appellant's second assignment of error alleges:
 {¶ 28} "THE TRIAL COURT ERRED IN PROHIBITING DEFENDANT FROM CONDUCTING NEW DISCOVERY AND FROM OFFERING A NEW EXPERT IN THE SECOND TRIAL."
 {¶ 29} In October 2003, the trial court provided notice that October 25, 2004 would be the date of the second trial. On January 7, 2004, appellant filed a motion to establish a discovery schedule with a form entry calling for the parties to disclose their experts by certain dates. On January 9, 2004, the trial court signed the proposed entry, which provided that appellant had to disclose his expert witnesses by July 1, 2004.
 {¶ 30} A pretrial was held on April 29, 2004. Apparently, appellant informed the court that he would be calling a new expert witness, Dr. Carlson, due to expected (albeit six months away) difficulties securing the live testimony of the experts who testified in the prior trial. Appellee objected on grounds of needless expense and attempts to project an aura of numerical superiority at trial. The court decided that appellant could not call this new expert witness that was not properly disclosed in the first trial's discovery and that he would have to read the prior testimony if the prior experts could not appear live. The court had specifically sanctioned appellant in the prior trial for a discovery violation concerning this expert and apparently wished the punishment of preclusion to stand.
 {¶ 31} Appellant complains that it was unreasonably contradictory for the court to allow appellee to present different witnesses from the first trial but preclude him from calling Dr. Carlson as a new expert. And, he contends that the trial court's April 29, 2004 oral decision to disallow the new expert contradicts the January 9, 2004 discovery judgment entry and is thus improper. Appellant concludes that since the court's preclusion of new experts violates its own order, appellant should have been permitted to call Dr. Carlson.
 {¶ 32} Appellee responds that a judgment entry providing a date for disclosure of experts does not preclude the court from determining that no new experts can be presented where they were not timely disclosed in discovery for the first trial. As aforementioned, this expert was specifically excluded from the first trial due to discovery violations. Appellee urges that the trial court's decision is discretionary. Appellee also claims that limiting experts is permissible where testimony would be cumulative and would result in the needless expense of deposing yet another expert. Lastly, appellee notes that appellant's failure to procure live expert testimony was caused by his own action or inaction regarding the witnesses who allegedly could no longer testify live and for whom he could have at least procured videotaped depositions.
 {¶ 33} As for appellant's contention that he should have been permitted to call Dr. Carlson because the court allowed appellee to present the testimony of two witnesses who did not testify in the first trial, there are some notable distinctions. One, appellant's witness was an expert, not a factual witness. As mentioned infra, the number of expert witnesses can be limited. Two, appellee's witnesses were properly disclosed in prior discovery. For instance, appellant's office manager, had been identified and deposed prior to the first trial. Appellee's wife, was identified as a witness, but appellant elected not to depose her and appellee chose not to call her. Thus, the two non-expert fact witnesses appellee presented at the second trial had been timely disclosed in the discovery process of the first trial. However, appellant's expert witness had been previously barred from testifying due to appellant's prior discovery violations. (We note that the propriety of that prior decision is not before us.) As a result, appellant's comparison of appellee's fact witnesses to appellant's expert witness who was not timely disclosed and was specifically barred from the first trial does not show unreasonable inconsistency on the part of the trial court and is not dispositive.
 {¶ 34} As for appellant's contention that the court could not change a discovery order, we must first point out that changing an interlocutory discovery order six months before trial is permissible as the order was not final since discovery matters are generally not final. See Wilson v. Barnesville Hosp., 7th Dist. No. 01BA40, 2001-Ohio-3499. Moreover, the exceptions crafted by the amendments to R.C. 2505.02 are inapplicable herein. See id. (noting the purpose of the relevant amendments dealt with disclosure of sensitive information). That is, the discovery order does not involve privileged matter, the disclosure of which could never be cured. See R.C. 2505.02(A)(3). Similarly, there is no indication that a meaningful and effective appellate review could not be afforded after trial. R.C.2505.02(B)(4)(b). See, also, Lightbody v. Rust (2000),137 Ohio App.3d 658, 666 (where the Eighth District held that a discovery order relating to rendering of legal opinion by deponent-attorney is not appealable as there can be a meaningful review on appeal where the issue is subject to standard evidentiary review). Thus, even if it does contradict the prior order, the court's decision barring new experts can be labeled merely a reasonably reconsidered interlocutory decision.
 {¶ 35} Furthermore, as appellee points out, the fact that the court adopted an entry providing for deadlines for disclosing experts is not necessarily contradicted by a later ruling that appellant's new expert cannot be utilized. Nevertheless, the real issue here is whether the barring order is reversible error. Unless there has been an abuse of discretion, the appellate court must uphold the trial court's decisions on discovery matters.State ex rel. The V Cos. v. Marshall (1998), 81 Ohio St.3d 467,469. Likewise, choices involving discovery sanctions are upheld unless the result is "so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." Nakoff v. Fairview Gen. Hosp. (1996), 75 Ohio St.3d 254,256.
 {¶ 36} The trial court can exclude the presentation of an expert witness by a party who failed to comply with pretrial orders. See Huffman v. Hair Surgeon, Inc. (1985),19 Ohio St.3d 83. See, also, Civ.R. 26; Civ.R. 37. And, the court can reasonably limit the number of expert witnesses. See Civ.R. 16(7) (stating that limiting the number of experts is an objective of the court in pretrial). Thus, reversal could only occur if the trial court's preclusion of Dr. Carlson from this trial was unreasonable, unconscionable or arbitrary and prejudicial.
 {¶ 37} Where a party is barred from calling an expert in the first trial as a sanction for discovery violations, appellee urges that the court can use its broad discretion to preclude that party from calling that same expert in a retrial. Under appellee's argument, it would not be unreasonable for the trial court to decide that any imposed sanctions from the prior trial will be maintained. Otherwise, the court's power to preclude expert witnesses due to discovery violations would be destroyed. Moreover, a court can reasonably limit the number of experts utilized on an issue in order to avoid repetitive testimony and/or to keep a reign on the expenses incurred in obtaining reports, conducting depositions and responding in kind.
 {¶ 38} Appellee's argument allows prior pretrial orders of the trial court to stand even in the face of a retrial. Adoption of appellee's argument would recognize that in practice, the trial court would not rehear all the prior pretrial motions and reissue decisions (including those concerning discovery sanctions) merely because a retrial was granted. A new trial calls for a fresh trial, which spans from jury selection to final judgment on the verdict. It does not call for an all new pretrial procedure with new rounds of reports to exchange and depositions to take.
 {¶ 39} In any event, appellant has failed to show prejudice to his defense. In fact, his only allegation of prejudice is that the exclusion of his new expert prohibited him from presenting live testimony. In response, we note that it is not the trial court's fault that he allegedly could not secure the presence of either of his prior experts for whom proper discovery was completed. He could have at least secured videotaped testimony but did not. The procedure of reading expert testimony into the record is a frequently used tool in civil trials that has the advantage of lowering costs and the elimination of surprise responses. We cannot presume prejudice from the mere fact that appellant read his experts' testimony into the retrial.
 {¶ 40} Also under this assignment of error, appellant presents an argument that he was entitled to access new medical information on prognosis and current condition in order to adequately prepare his case. In the weeks prior to trial, appellee presented appellant with the latest medical records, which they were planning on introducing as exhibits. Appellant claims that the court precluded him from discovering this information along with its preclusion on new experts discussed above.
 {¶ 41} Appellee responds that appellant failed to conduct further discovery and states that the court's only discovery prohibition dealt with barring new experts. When appellant complained at trial about the lack of access to these records, the court found that appellant chose not to follow-up and perform ongoing discovery regarding the plaintiff's condition and explained that the court's discovery order was limited to barring the new expert. (Tr. 29-30, 44).
 {¶ 42} Appellee also notes that when they tried to give the medical information to appellant's attorneys two weeks prior to trial, appellant's attorneys were too busy trying to have the judge disqualified to care about their offer of information. Appellee concluded by pointing out that they did not even introduce most of the supposedly offending records at trial. They only introduced the treating doctor's testimony on dental implants, which was a recap of his prediction from the first trial. As appellee notes, appellant successfully restricted the doctor's testimony to the care previously predicted. (Tr. 22-40).
 {¶ 43} Appellant counters by alleging that the trial judge's response to the Affidavit of Disqualification filed in the Supreme Court refers to the court's "decision to suspend discovery." First, the court's response is not part of the record in this case. And, seeing as the court was only responding to appellant's claim that the court prohibited him from calling his new expert, the court's alleged statement cannot be considered some blanket admission to be used to show that the court also barred appellant from seeking new records on appellee's recent medical progress. Notably, appellant's affidavit did not mention being barred from all discovery as he now claims. Rather, it only complained of preclusion of his new expert. Additionally, appellant's motion filed regarding deadlines for discovery only addressed disclosure of experts.
 {¶ 44} We cannot assume, based on appellant's after the fact claim, that the court precluded him from conducting discovery of new medical records relevant to appellee's current condition. This argument is overruled.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 45} Appellant's third assignment of error alleges:
 {¶ 46} "THE TRIAL COURT ERRED IN PERMITTING PLAINTIFF TO COMMENT AND OFFER TRIAL TESTIMONY ON THE IRRELEVANT ISSUE OF STANDARD OF CARE."
 {¶ 47} Appellant stipulated that he breached the standard of care in failing to diagnose appellee in a timely manner. The remaining issues for the jury were proximate cause and damages. Appellant thus argues that any references to or evidence dealing with standard of care were improper. He claims that all such references and evidence were prejudicial and inflammatory. However, appellant fails to state here what these references were or where they are contained in the transcript. We need not do appellant's work for him. Thus, this assignment of error should be overruled on these grounds alone. (See Procedural Issues supra.)
 {¶ 48} In any event, under the unique facts and circumstances existing herein, it appears that the argument appellant is trying to make is without merit. From reviewing his statement of the case and trying to mix and match the contents of it with the various assignments and subassignments, we glean that appellant is mainly complaining about testimony presented by Dr. Neary and Dr. Assael and certain cross-examination of Dr. Pannunzio himself. No objections were entered during the cited portion of Dr. Neary's testimony mentioning some standard of care issues or during the cross-examination of Dr. Pannunzio. (Tr. 545-549, 692-702). Objections to a line of questioning regarding particular witnesses must be entered to preserve the issue. Thus, any such issues are waived.
 {¶ 49} Dr. Assael's direct examination can be characterized as touching upon some standard of care issues and criticizing appellant's care of appellee. This expert listed various symptoms from which a myxoma should be diagnosed. (Tr. 451-452). Thereafter, appellant asked to approach the bench. A discussion was held off the record. (Tr. 453). When back on the record, the court noted an objection to the line of questioning. (Tr. 453). As was typical throughout the case, appellant failed to put the specifics of his objection on the record as required by Evid.R. 103(A)(1).
 {¶ 50} Appellee's counsel then continued to question Dr. Assael about the acceptable care where symptoms of myxoma are present. Over another objection, he stated that if a small x-ray shows an abnormality, a larger x-ray should be taken or a referral should be made. (Tr. 455-456). He was also asked to share his conclusions about the care received over appellant's objection. (Tr. 457). He opined that the very first periapical x-ray showed a gross and obvious pathology and that referral to a specialist was required. (Tr. 457-458).
 {¶ 51} Appellant cites a Ninth District case holding that where complete liability is admitted, the nature and extent of the injury are the only remaining issues. Johnson v. Knipp
(1973), 36 Ohio App.2d 218, 221-222. That court thus determined that the plaintiff could not introduce evidence of the defendant's intoxication at the time of the accident (except for impeachment purposes if he testified as to facts surrounding the accident). Id.
 {¶ 52} We do not find Johnson persuasive due to the factual dissimilarities of that case with this case. Evidence of a defendant's intoxication (i.e. an inflammatory explanation of why he caused the accident) differs from mere testimony that the defendant caused an accident and various details of the accident that help illustrate the background of the case. It certainly differs from testimony on the symptoms of a tumor in the jaw and how a black spot should have resulted in a larger x-ray or a referral. The defendant in Johnson stipulated to complete negligence, including proximate cause. Here, only duty and breach were admitted, and proximate cause was still at issue. As appellee explains, some of the proximate cause issues were hard to extract from the standard of care issues. Thus, this case is distinguishable, not to mention not binding.
 {¶ 53} As appellee points out, Dr. Assael also made estimations as to the size of the tumor at the time of the first visit. (Tr. 459-462). He concluded that he could not give an exact size due to the standard of care issues such as the lack of a panoramic x-ray, which would have disclosed the full extent of the tumor. (Tr. 462). Appellee urges that in order to understand proximate cause and damages, the jury needed to know when and how appellant was negligent.
 {¶ 54} As appellee notes, his case was based upon the theory that the earlier the diagnosis was made, the less deformity he would have suffered. The location and growth of the tumor at various points in the course of treatment were key aspects of the case. The multiple breaches in the standard of care from October through April are inextricably intertwined with the issues of proximate cause and damages. Due to the direct correlation between the timing of the negligent act and the extent of damages with standard of care issues, most of the objected to testimony related to standard of care was relevant and admissible.
 {¶ 55} Appellant also appears to suggest that it was improper to mention that the January 1999 panoramic x-ray was missing. This x-ray is a critical piece of evidence that could have established the size of the tumor over three months before appellant finally acted. It was extremely relevant to proximate cause and damages. It was not improper for appellee to explain why he could not more accurately explain the growth of this particular tumor, especially where appellant seems to blame the loss of the panoramic x-ray on him or on the specialist. And, appellant does not contend that he stipulated that he was negligent in losing the January 1999 x-ray; he merely stipulated to misdiagnosing the x-rays. (Tr. 331).
 {¶ 56} Some evidence regarding the tumor size and explaining why plaintiff's evidence was lacking regarding prior tumor size was relevant to the proximate cause and damages issues even though it also related to standard of care. See State v. Maurer
(1984), 15 Ohio St.3d 239 (stipulation to cause of death does not preclude state from introducing photographs of murder victim and scene). And, even if some isolated statements may have gone into the stipulated standard of care issue more than necessary, prejudice is not apparent here, as it may be in a case where evidence of a defendant's intoxication or drug use is admitted. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER FOUR {¶ 57} Appellant's fourth assignment of error contends:
 {¶ 58} "THE TRIAL COURT ERRED IN PERMITTING PLAINTIFF'S EXPERT TO REFERENCE AND READ FROM LEARNED TREATISES AS SUBSTANTIVE EVIDENCE AND TO PRESENT AN IMPROPER SLIDE SHOW."
 {¶ 59} Appellee's expert, Dr. Assael, was asked about various statements he made in a portion of a treatise he wrote entitled,Surgical Management of Odontogenic Cysts and Tumors. Appellant objected, but the objection was overruled since Dr. Assael was the author of the medical literature being referenced. (Tr. 419).
 {¶ 60} Appellant claims that Dr. Assael read from and referenced the treatise. However, in the pages cited by appellant in the statement of the case (no cites to the record are contained under this assignment of error) there is no indication that he read from this treatise. Thus, we will only address whether his testimony relative to his expert knowledge, that is also contained within a treatise he authored, was permissible.
 {¶ 61} Appellant states that medical treatises are not admissible as substantive evidence. Rather, they can only be used for impeachment purposes. He cites Evid.R. 706, which provides that statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art are admissible for impeachment if the publication is either: (A) relied upon by an expert witness in reaching an opinion; or (B) established as reliable authority by the testimony or admission of the witness, by other expert testimony or by judicial notice. See, also, Stinson v. England (1994),69 Ohio St.3d 451 (a learned treatise may be used for impeachment purposes to demonstrate that an expert witness is either unaware of the text or unfamiliar with its contents). Since the treatise was used in direct examination to support that witness's testimony, appellant believes its use was improper.
 {¶ 62} The Supreme Court has stated the following:
 {¶ 63} "Because works of professional literature contain statements that if introduced as evidence would fall within the definition of hearsay, and because the Ohio Rules of Evidence, unlike the Federal Rules of Evidence, do not contain a learned-treatise exception to the hearsay rule, such works `are inadmissible as independent evidence of the theories and opinions therein expressed.' (FN1) [noting the uses of literature contained in Evid.R. 706]. Piotrowski v. Corey Hosp. (1961),172 Ohio St. 61, 69, 15 O.O.2d 126, 173 N.E.2d 355. InPiotrowski, we noted that the reasons for exclusion include the inability to verify the validity of the opinions and conclusions within the works and the lack of opportunity to cross-examine the authors of those opinions and conclusions. Id. If, during direct examination, a witness were permitted to offer statements from professional literature to prove the truth of the matter asserted in those statements, the witness would be acting as a conduit for the out-of-court statements of the authors of those literary works." Beard v. Meridia Huron Hosp., 106 Ohio St.3d 207,2005-Ohio-4787, ¶ 23-24 (and then concluding that a witness's referral to specific statements in professional literature as substantive evidence is improper, but an expert witness canrefer to the literature as being part of the basis for thatexpert's opinion).
 {¶ 64} We agree with appellee's conclusion that since Dr. Assael was the author of the treatise to which he referred, the reasons for the exclusion expressed above in Beard do not apply and the hearsay rule is not violated. See Price v. ClevelandClinic Found. (1986), 33 Ohio App.3d 301, 306-307 (where the Eighth District allowed plaintiff to present scientific papers where these papers were written by the defendant, construing them as admissions under Evid. R. 801(D)(2) and thus not hearsay).
 {¶ 65} If the declarant testifies at trial, then the statement to which he testifies is not hearsay. Evid. R. 801(C). Here, Dr. Assael testified to his opinions at trial. Furthermore, the Supreme Court in Beard held that the expert can refer to literature as being part of the basis for his opinion. Beard,106 Ohio St.3d 207, at ¶ 24. The Court noted that expert testimony is inherently based upon various sources including literature. Id. at ¶ 25, citing Evid.R. 702, 703. The Court pointed out:
 {¶ 66} "Experts have been permitted to testify regarding the information that provides the basis for their opinions. SeeState v. Echols (1998), 128 Ohio App.3d 677, 698. Because experts are permitted to base their opinions on their education, including their review of professional literature, training, and experience, it follows that experts are also permitted to testify regarding that information. Accordingly, we hold that expert witnesses are permitted to testify that their opinions are based, in part, on their review of professional literature." Id. at ¶ 26.
 {¶ 67} Here, Dr. Assael referred to medical literature. He did not read specific statements as substantive evidence. It is not fatal that the literature closely reflects his testimony at trial. Since he authored the literature, the reflection is natural.
 {¶ 68} We reiterate that the author was subject to cross-examination and could personally verify his opinions that were also reached in his literature. The fact that he wrote a book on the topic and still holds the same opinions expressed in his book is a wholly distinguishable scenario from one where an expert testifies to the contents of someone else's literature. Thus, this argument is overruled.
 {¶ 69} Next, appellant complains that on redirect, Dr. Assael read from a medical article written by a Dr. Schneck that appeared in the Journal of Oral and Maxillofacial Surgery, a publication which Dr. Assael edits. On redirect, Dr. Assael was asked if he was familiar with the article, Odontogenic Myxoma,Report of Two Cases with Reconstructive Considerations.
Appellant objected, and an off the record discussion was held. The court allowed the testimony to proceed. (Tr. 519).
 {¶ 70} It was noted that various articles were presented to Dr. Assael by the defense on cross-examination. Dr. Assael was asked if this was the same author who wrote an article referred to by the defense on cross-examination. Defense counsel then asked to see the article to see if he had a copy. (Tr. 519-520). No further complaint was made, implying that the defense agreed that it was an article by the same author presented to impeach Dr. Assael on cross-examination. (Tr. 520). Dr. Assael then read a twenty-nine word description of an odontogenic myxoma and a thirty-three word description of the case study described. (Tr. 520).
 {¶ 71} Appellee points out that these two small readings on redirect were only offered in response to articles by the same author which Dr. Assael was asked to read on cross-examination. The defense focused on the fact that certain articles published in the journal Dr. Assael edits described a myxoma as a slow
growing tumor. And, the defense then noted that Dr. Assael testified that a myxoma is a rapidly growing tumor. Appellee claims that on redirect, it was proper to counter the impeachment strategy of cross-examination by showing that the excerpt from the article from which Dr. Assael was forced to read was written by an author who also wrote an article agreeing that myxoma does grow rapidly. (Actually, appellee claims that they used the exact same article on redirect that was used on cross-examination, but this does not appear to be true as the article's names on cross and redirect differ, and appellee's counsel only asked Dr. Assael if the article presented on redirect was by the same author as the one presented in cross).
 {¶ 72} Appellant counters that the use of medical literature on redirect to rehabilitate a witness is strictly limited to the same literature used during cross-examination. He cites Hinklev. Cleveland Clinic Found., 159 Ohio App.3d 351, 2004-Ohio-6853
in support of this claim. In that case, the Eighth Appellate District had to answer whether it was proper to allow rehabilitation of a witness on redirect with the same treatise that was used to impeach him on cross-examination. Id. at ¶ 29. They allowed such rehabilitation, noting the unfairness in cases where the defense only used select portions of the treatise without mentioning the unfavorable portions. Id. at ¶ 38-39. However, the Eighth District concluded, "This is not to say that a party may use a learned treatise to rehabilitate an expert witness who was not impeached with the learned treatise during cross-examination." Id. at ¶ 39.
 {¶ 73} This statement can be read as a mere limiting statement by the appellate court to restrict its ruling to the facts of its case, or as a flat statement that one cannot use a treatise to rehabilitate if no treatise was used on cross-examination. It does not necessarily mean that they would hold that an expert impeached on cross-examination by literature cannot be questioned on rehabilitative redirect using other literature written by the same author. Regardless, that case is merely persuasive authority.
 {¶ 74} Appellee would basically have us extend the Eighth District's rule (of rehabilitation through literature on redirect) to include other literature by the same author whose work had been used to impeach the expert on cross-examination. Under such rule, if the defense finds two articles by the same person, only one of which is favorable to the defense, and uses that article to impeach the plaintiff's expert, then the plaintiff could rehabilitate their expert by utilizing the second article by that same author (published in that same journal edited by their expert himself). That is, if the author used to impeach Dr. Assael has also expressed an opinion published in the same journal in line with that of Dr. Assael's, such opinion in medical literature could be used in redirect as the door was opened in cross-examination.
 {¶ 75} We note (although appellant does not) that even the Eighth District's limited holding allowing rehabilitation from the same treatise is not a majority rule. See Hinkle,151 Ohio App.3d 351 (noting that their decision conflicted with Toth v.Oberlin Clinic, Inc., 9th Dist. No. 01CA7891, 2002-Ohio-2211). In Toth, the Ninth District held that rehabilitation on redirect is not mentioned in Evid.R. 706 and thus is not permissible use of a treatise. See, also, Fehrenbach v.O'Malley, 1st Dist. No. C4-0128, 2005-Ohio-5554, ¶ 34.
 {¶ 76} Notwithstanding the proper scope of the rehabilitation rules, if prejudice has not been established, then a new trial is not required for any inquiry that is beyond the scope of the rules. Thus, we shall proceed to consider whether the complained of testimony is prejudicial. The disputed portions of the article Dr. Assael referred to are as follows:
 {¶ 77} "The lesion is very destructive, and although it is considered benign and does not metastasize, it is locally aggressive with a propensity to recur and progress if injudiciously managed. * * *
 {¶ 78} "Well, this case study is a 24-year-old lady, and the patient refused treatment earlier and was able to cope with the slow mandibular expansion until recent rapid growth finally interfered with function." (Tr. 520).
 {¶ 79} The disputed testimony is a mere two sentences of approximately thirty words each. The statement that such tumor can grow fast confirms Dr. Assael's testimony. Nonetheless, his testimony was also confirmed by that of Dr. Neary, who described a myxoma as aggressive and able to grow very rapidly. (Tr. 541-542). Thus, these limited references have a de minimis impact. From reading the two sentences set forth above and considering them in context of the entire trial, reversible prejudice is not apparent.
 {¶ 80} Next, appellant complains that Dr. Assael's slide presentation on tumor growth rate may have been irrelevant because it relied in part on slides depicting ameloblastoma but this case dealt with myxoma, and there was no explanation as to how the two conditions are related.
 {¶ 81} After Dr. Assael presented numerous slides on the growth of a certain ameloblastoma over a certain dated time period, the defense finally objected on the grounds that Dr. Assael was not talking about a myxoma. (Tr. 430). The doctor then explained the two types of tumors as sister tumors: both benign, both odontogenic, both aggressive. He stated that they look exactly the same on x-ray and show the same behavior.
 {¶ 82} "As I pointed out, the reasons I show these is for the purpose of illustrating and demonstrating to you how these tumors grow, because I happen to have these cases in which I have x-rays over time showing the growth and they illustrate the point. The later slides will show exactly the same thing with myxoma.
 {¶ 83} "But the point is that this illustrates how these benign odontogenic tumors grow and how they infiltrate. I can tell you in my experience that a myxoma behaves exactly like this. This is a good illustration and fairly shows what a myxoma does under these circumstances, and no pathologist and no surgeon could even look at any of these x-rays and tell if it's a myxoma or an ameloblastoma, because they behave exactly the same in this fashion." (Tr. 431).
 {¶ 84} Dr. Assael did state that a myxoma grows faster than an ameloblastoma. However, this would only help appellant's case in terms of the slides showing growth because the faster the growth, the more damage done by repeated misdiagnosis. Dr. Assael then showed the slides of the myxoma.
 {¶ 85} A trial court's ruling on a demonstrative exhibit is reviewed under the abuse of discretion standard whereby the trial court has the discretion to determine whether the exhibit used for illustrative purposes is helpful or misleading. State v.Palmer (1997), 80 Ohio St.3d 543, 566. Here, there is no indication that the court abused its discretion in failing to strike the ameloblastoma slide presentation after the fact. SeeAkers v. Levitt (Jan. 27, 1992), 2d Dist. No. 12471 (trial court did not abuse discretion in allowing presentation of slides of people with severe psoriasis where doctor stated they fairly depicted plaintiff's condition). Dr. Assael stated that the two conditions and their field of growth are identical when viewed on x-rays. It appears the slides were an illustrative and relevant tool to help the jury rather than a prejudicially misleading use of a different type of tumor. In fact, in their proffer of expert testimony, the defense notes the similarities of the two tumors and defines them in the same manner. (Tr. 531). In any case, reversible prejudice has not been established. This argument is overruled.
 ASSIGNMENT OF ERROR NUMBER FIVE {¶ 86} Appellant's fifth assignment of error provides:
 {¶ 87} "THE TRIAL COURT ERRED IN LIMITING THE SCOPE OF THE TRIAL TESTIMONY OF DEFENDANT'S EXPERT."
 {¶ 88} Appellant called Dr. Zarbo to the stand as his pathology expert. At this point, appellee asked the court to inquire into the parameters of Dr. Zarbo's testimony regarding the x-rays. Appellee worried that appellant would try to use Dr Zarbo to replace Dr. Li, whose testimony had to be read because appellant could not secure his live presence. Appellee urged that this would be improper because Dr. Zarbo is not qualified to read dental x-rays. Appellee explained that Dr. Zarbo is not licensed to practice dentistry and never has so practiced, he does not perform surgery, and he has never seen myxoma in a patient in person. Moreover, defense counsel already admitted that Dr. Zarbo is not an expert in the practice of dentistry and is not qualified to give opinions as a dentist. (Tr. 848-849). Appellee noted that many people look at x-rays (like x-ray technicians or dental hygienists), but this does not make them experts. Appellee pointed out that Dr. Zarbo had previously answered negatively when asked, "Do you consider yourself an expert in the reading and interpreting of x-rays?" (Tr. 852). Appellee pointed out that if this expert in one field is permitted to expound on the topic of x-rays, which are outside his field, his statements would be improperly granted an "aura of expertise" and, Evid.R. 702 was promulgated to prevent such occurrence.
 {¶ 89} Appellant responded that Dr. Zarbo also testified that he regularly reviews dental x-rays, that he is competent to read these x-rays due to his prior dental training and that he must routinely correlate the anatomical extent of the lesion from viewing the x-ray with the microscopic slides before signing a diagnosis. (Tr. 850, 895-896). Still, appellant also assured the court that he did not intend to have Dr. Zarbo go into detail with the x-rays as Dr. Li did and that he was not going to have Dr. Zarbo discuss the tumor's growth from viewing the x-rays. (Tr. 852-853). Defense counsel advised:
 {¶ 90} "the only thing I would do with the panorex would be, again, to show this is the tumor and this is something he would look at as a pathologist. He would have this slice of tissue, and then he would get the panorex to see where this thing is in the jaw as a pathologist * * * he would explain this is how we do it in pathology." (Tr. 853-854).
 {¶ 91} Despite appellee's objection, the court allowed Dr. Zarbo to show the x-ray and testify about how a pathologist correlates the x-ray of the tumor with the slides. (Tr. 878-879, 895-896, 898-900). Dr. Zarbo also testified that he believed the tumor occupied the majority of the mandible in October 1998. (Tr. 903, 908).
 {¶ 92} True, the court ruled that the testimony regarding the x-rays would be very limited. (Tr. 855). But, appellant was the one who assured the court that he only intended to put on limited testimony in the first place. (Tr. 852-856).
 {¶ 93} While Dr. Zarbo may regularly look at provided x-rays in order to determine the location of the tumor he is viewing under the microscope, this does not make him an expert on x-ray interpretation. Appellant and Dr. Zarbo himself had previously admitted that Dr. Zarbo is not an expert at reading or interpreting x-rays.
 {¶ 94} Regardless, defense counsel advised that his use of the x-rays would only be to establish how a pathologist correlates what he sees in the slides with the x-rays provided. As the court allowed the use of x-rays for this stated purpose, appellant cannot now complain that the trial court limited testimony to coincide with appellant's stated objectives. Accordingly, this assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER SIX {¶ 95} Appellant's sixth assignment of error alleges:
 {¶ 96} "THE TRIAL COURT ERRED IN PERMITTING PLAINTIFF'S COUNSEL TO ENGAGE IN IMPROPER AND PREJUDICIAL CLOSING ARGUMENTS."
 {¶ 97} Appellant claims that opposing counsel's closing argument deprived him of his right to a fair trial in four ways. Once again, there are no citations to the record. However, as aforementioned, we will scan the statement of the case for relevant citations regarding these arguments.
 {¶ 98} Before going into each of the four complaints, we note the well-established legal principle that the parties have wide latitude in closing arguments to recap what the evidence has shown and what inferences can be drawn from that evidence. Statev. Jackson, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 110; Pesek v.University Neurologists Assn., Inc. (2000), 87 Ohio St.3d 495,501. If the comments reflect the evidence presented at trial, they are not improper. Id.
 {¶ 99} First, appellant complains of an allegedly irrelevant comment made during closing arguments about the stipulated standard of care issue. In the statement of the case, appellant cites only to page 1035 of the transcript with regards to this issue. However, counsel was not going into the standard of care issues that appellant claimed were irrelevant in assignment of error number three. Rather, counsel was setting forth the rationale behind the defense theory that the tumor did not grow during appellee's treatment with appellant.
 {¶ 100} Counsel was merely noting that the defense wishes the jury to believe that appellant's misdiagnosing the January panoramic x-ray (which is missing) as a rampant infection necessarily means that the tumor was already very large in January and did not cause more damage by his misdiagnosis. This does not go into a stipulated standard of care issue. Instead, it is attempting to clarify a defense theory and then rebut it. Furthermore, there was no objection to this comment, and thus the issue is waived for purposes of appeal. As such, this argument is without merit.
 {¶ 101} Second, appellant argues that opposing counsel inappropriately commented on two experts not called to testify. He cites to a portion of closing arguments where appellee's counsel stated, "we were talking about the periapical X-rays that you've been hearing about. And there were two experts, Dr. Teknos and Dr. Hartner, who said that Dr. —." Appellant's counsel objected, and another off the record side bar was held. (Tr. 1033). The court overruled the unspecified objection, and appellee's counsel continued:
 {¶ 102} "Dr. Teknos, who has not been brought into this courtroom, was presented as an expert witness. We had to go to Michigan to take his deposition. And his defense in this case was Dr. Pannunzio did nothing wrong in this case, shouldn't have — he shouldn't be held accountable. But when they finally found Dr. Li, the entire defense changed from no responsibility to, well, we're responsible for making this mistake, but it didn't cause any harm. So, we got a change in defense." (Tr. 1034).
 {¶ 103} Appellee responds that they were just reviewing the unobjected to testimony. For instance, appellant read the prior testimony of their expert, Dr. Li, into the record. On cross-examination, Dr. Li was asked if Dr. Teknos was retained as an expert, if he knows Dr. Teknos and if he read the deposition of Dr. Teknos. (Tr. 827). Dr. Li was also asked if Dr. Teknos testified that from his review of the October 3, 1998 periapical x-ray, the tumor was quite small at that time. (Tr. 828). There was no objection regarding the substance of the opinion originally generated by Dr. Teknos. In fact, it was appellant who read Dr. Li's testimony into the record revealing the opinion of previously consulted defense expert.
 {¶ 104} Additionally, Dr. Zarbo was asked without objection whether he was provided with any reports or testimony from Dr. Teknos or Dr. Hardner. (Tr. 935). Appellant presented no objections to the introductions of these two witnesses into the trial record.
 {¶ 105} Failing to object (or seek redaction of allegedly irrelevant testimony) at a time when the issue could have been timely addressed, waives any objection to recapping the information in closing arguments. See State v. Shaw, 7th Dist. No. 03JE14, 2004-Ohio-5121, ¶ 18 (failure to object to the use of evidence when the alleged error could be remedied waives the right to address that issue on appeal); Evid.R. 103(A)(1). Otherwise, appellant would be rewarded for inviting the alleged error. See, e.g., State ex rel. Kline v. Carroll,96 Ohio St.3d 404, 2002-Ohio-4849, ¶ 27 (party not entitled to take advantage of an error that he himself invited or induced the court to make). This argument is overruled.
 {¶ 106} Third, appellant states that opposing counsel should not have discussed the circumstances surrounding the reading of Dr. Li's testimony and imply that the failure to obtain videotaped testimony was to avoid a credibility assessment. Appellee's counsel began to say, "if they wanted you to see Dr. Li and evaluate his credibility [objection entered] they could have gone with videotape." An unrecorded side bar was held, and the court ended up overruling the objection. (Tr. 1039). Appellee's counsel then added that when a doctor is too busy to testify, he would take the doctor's testimony via videotape so the jury could assess that doctor's credibility. (Tr. 1040).
 {¶ 107} There is no apparent problem with noting the obvious fact that the opinion of the defense's main expert was presented by reading a transcript. Nor does there appear impropriety with pointing out to the jury that it was difficult to assess credibility where they could not see the witness as he testified.
 {¶ 108} Appellant's fourth and final argument is confusing. Under the sixth assignment of error he merely states his fourth argument as follows: "Most importantly, Plaintiff's counsel's comment on the fact that the defense did not use the radiographs was clearly improper." In reviewing the relevant portion of appellant's statement of the case, we find the following reference to this argument: "Plaintiff's counsel improperly commented on Dr. Pannunzio's failure to videotape Dr. Li in order to avoid the jury from weighing his credibility [discussed supra], especially with regard to the radiographs. Once again,the Trial Court erroneously prohibited Dr. Pannunzio from usingthe radiographs altogether." (Tr. 1039-1040). (Emphasis added to portions seemingly relevant to this argument). However, when the pages referred to by appellant are read, no discussion of the defense failing to use x-rays can be found. (Tr. 1039-1040). There is merely a quick reference to the missing January x-ray. This argument is overruled as the pages cited do not relate to the argument made. Accordingly, this assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER SEVEN {¶ 109} Appellant's seventh assignment of error contends:
 {¶ 110} "THE CUMULATIVE EFFECT OF THE TRIAL COURT'S ERRORS WAS PREJUDICIAL AND DENIED DEFENDANT A FAIR TRIAL."
 {¶ 111} Appellant asks us to review our conclusions in assignments of error numbers one through six to determine if any errors that we found were not prejudicial individually become prejudicial when combined with other harmless errors.
 {¶ 112} First, the court must find that multiple errors were committed at trial. State v. Madrigal (2000),87 Ohio St.3d 378, 398. Then, the court must determine if these separately harmless errors violated the defendant's right to a fair trial when the errors are considered together. Id. at 397.
 {¶ 113} Even if we take the arguments that bordered on error and find in favor of appellant for sake of argument, the cumulative error doctrine would not require reversal here. SeeState v. Bajah, 7th Dist. No. 03CO16, 2005-Ohio-185 (where this court held multiple instances of error were all minor and had no real relation to the main issue at trial). The issues found not to be prejudicial were essentially passing pieces of a trial resulting in a transcript totaling over one thousand pages. There was compelling evidence that between October 3, 1998 and April 20, 1999, the tumor grew from a small spot to a large presence and/or that early diagnosis would have prevented much of appellee's loss. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER EIGHT {¶ 114} Appellant's eighth and final assignment of error provides:
 {¶ 115} "THE TRIAL COURT ERRED IN GRANTING PLAINTIFF'S MOTION FOR PREJUDGMENT INTEREST."
 {¶ 116} Appellee sought prejudgment interest under R.C.1343.03(C). A hearing was held on January 27, 2005. The court granted appellee $472,458.29 in prejudgment interest in a July 25, 2005 judgment entry. Appellant sets forth three subassignments regarding prejudgment interest.
 SUBASSIGNMENT OF ERROR NUMBER ONE {¶ 117} First, appellant claims that R.C. 1343.03(C), the prejudgment interest statute, is unconstitutional. Appellant states the following: prejudgment interest was known at common law; there is a right to a jury trial in cases where the right applied in common law; and, the right to a jury trial cannot be eliminated by statute.
 {¶ 118} Appellee counters that the Supreme Court has already decided that the prejudgment interest statute does not violate the right to a jury trial. Galayda v. Lake Hosp. Sys., Inc.
(1994), 71 Ohio St.3d 421, 427-428.
 {¶ 119} Appellant responds that Galayda only addressed the limited issue of whether the statute places undue pressure on the defendant to settle rather than to freely exercise his right to a jury trial.
 {¶ 120} In Galayda, the Court made various statements as to why R.C. 1343.03 does not violate the right to a jury trial. First, the Court held that imposing a good faith effort to settle requirement does not force a defendant to forgo the right of having a jury determine the existence of his liability in tort. Id. at 427. Next, the Court held that R.C. 1343.03 does not impose a penalty upon defendants for having exercised their right to a jury where prejudgment interest is awarded against them. Id. Then, the Court held:
 {¶ 121} "Similarly, it is the jury's function to determinethe amount of damages suffered by a plaintiff. Since determiningthe amount of prejudgment interest awards is entirely separateand distinct from determining the amount of damages suffered bythe plaintiff, and does not involve questions of fact, R.C.1343.03 does not violate the fundamental constitutional right totrial by jury.
 {¶ 122} "Defendant's contention that R.C. 1343.03 violates the Due Process Clause of the Ohio Constitution is unfounded. Prejudgment interest statutes have consistently been found to be constitutional by courts both in Ohio and elsewhere. See, e.g.,Hardiman v. Zep Mfg. Co. (1984), 14 Ohio App.3d 222,14 OBR 250, 470 N.E.2d 941; Mills v. Dayton (1985),21 Ohio App.3d 208, 21 OBR 222, 486 N.E.2d 1209; Edgerson v. Cleveland Elec.Illum. Co. (1985), 28 Ohio App.3d 24, 28 OBR 34,501 N.E.2d 1211. See, generally, Annotation, Validity and Construction of State Statute or Rule Allowing or Changing Rate of Prejudgment Interest in Tort Actions (1985), 40 A.L.R.4th 147." Id. at 428. (Emphasis added).
 {¶ 123} Thus, the Court specifically opined that the right to have a jury determine damages is not violated by the prejudgment interest statute just because the judge makes findings on whether various factors exist. We also note that the Court cited a case that specifically dismissed the arguments set forth by appellant herein.
 {¶ 124} In Hardiman, the Eighth District held that the statute does not unconstitutionally penalize the defendant for choosing to go to trial and is not an unconstitutional use of a judge rather than a jury. 14 Ohio App.3d at 227. That court continued:
 {¶ 125} "The prejudgment interest issue is rather a collateral matter to the tort action, more akin to an award of attorney fees, which does not require a jury trial, even though a monetary award is involved. We find nothing in appellant's argument to support its contention that the issue of lack of good faith must be presented to a jury. The judge at trial who is familiar with the case, the issues, and the parties, and who has had the opportunity to observe the progress and conduct of the case, is capable of determining if either party has failed to make a good faith effort to settle the case. Appellant has demonstrated no constitutional grounds which justify overturning the legislature's determination that a judge, not a jury, should decide the good faith issue." Id.
 {¶ 126} In conclusion, the Supreme Court has stated that R.C.1343.03 does not violate the right to a jury trial where a judge determines whether prejudgment interest is available. As such, this argument is overruled.
 SUBASSIGNMENT OF ERROR NUMBER TWO {¶ 127} In the alternative, appellant argues that the prejudgment interest award must be reduced to zero because appellee failed to properly test the jury verdict to distinguish between past and future damages. Appellant claims that appellee, as the party seeking the benefit of the prejudgment statute, was required to test the jury verdict by submitting interrogatories to categorize the type of damages as past and future for purposes of the prejudgment interest award. In support of this claim, appellant cites a Supreme Court case. Buchanan v. Wayne TraceLoc. Sch. Dist. Bd. Of Edn. (1995), 73 Ohio St.3d 250 (where the Court held that the political subdivision had the burden to test the verdict with interrogatories to determine between future and past medical and wages where it wished to use the collateral benefits statute to decrease its liability).
 {¶ 128} Appellee contends that the distinction between past and future damages for purposes of prejudgment interest is inapplicable to this case because this distinction was created by amendment effective after this cause of action was filed. The trial court agreed with appellee's construction and wrote a well-reasoned analysis of the issue.
 {¶ 129} Previously, R.C. 1343.03(C) stated:
 {¶ 130} "Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."
 {¶ 131} On June 2, 2004, an amendment to R.C. 1343.03 became effective. See 2004 H 212. Now, R.C. 1343.03(C) provides:
 {¶ 132} "(1) If, upon motion of any party to a civil action that is based on tortious conduct, that has not been settled by agreement of the parties, and in which the court has rendered a judgment, decree, or order for the payment of money, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case, interest on the judgment, decree, or order shall be computed as follows:
 {¶ 133} "(a) In an action in which the party required to pay the money has admitted liability in a pleading, from the date the cause of action accrued to the date on which the order, judgment, or decree was rendered;
 {¶ 134} "(b) In an action in which the party required to pay the money engaged in the conduct resulting in liability with the deliberate purpose of causing harm to the party to whom the money is to be paid, from the date the cause of action accrued to the date on which the order, judgment, or decree was rendered;
 {¶ 135} "(c) In all other actions, for the longer of the following periods:
 {¶ 136} "(i) From the date on which the party to whom the money is to be paid gave the first notice described in division (C)(1)(c)(i) of this section to the date on which the judgment, order, or decree was rendered. * * *
 {¶ 137} (ii) From the date on which the party to whom the money is to be paid filed the pleading on which the judgment, decree, or order was based to the date on which the judgment, decree, or order was rendered.
 {¶ 138} "(2) No court shall award interest under division(C)(1) of this section on future damages, as defined in section2323.56 of the Revised Code, that are found by the trier offact." (Emphasis added).
 {¶ 139} R.C. 1343.03(C)(2), appellant urges, prohibits the prejudgment interest award herein due to the inability to determine what part of the damages awarded here were based on past damages. This section states the new rule that the plaintiff is not entitled to prejudgment interest on future damages.
 {¶ 140} Appellant first claims that use of the amended statute would not be a retroactive application of law because the judgment (upon which the later award of prejudgment interest was based) was rendered after the effective date of the amendment. In the alternative, appellant claims that retroactive application is permissible because this is a remedial statute with a clear legislative intent to be applied retroactively.
 {¶ 141} Appellee counters that since prejudgment interest started on the date the cause of action accrued, use of a statute different than the one existing on that date would constitute a retroactive application in a pending case. Appellee then urges that the statute is intended to be applied prospectively only and does not apply to this case that has been pending for years prior to the amendment.
 {¶ 142} There is a two-part test for determining whether a statute should be applied retroactively. VanFossen v. Babcock Wilson Co. (1988), 36 Ohio St.3d 100. The first part of the test is based upon a rule of statutory construction set forth by the legislature. Pursuant to R.C. 1.48, statutes are presumed to be prospective in application unless expressly made retroactive. The second part of the test is based upon constitutional limitations. Section 28, Article II of the Ohio Constitution. Specifically, the legislature is prohibited from retroactively applying substantive laws that affect substantive rights, as opposed to remedial laws which they can apply retroactively. However, the court cannot address the second part of the test, dealing with whether the law is remedial or substantive, unless it has determined that the legislature clearly expressed a retroactive intent. VanFossen, 36 Ohio St.3d at 106.
 {¶ 143} "[W]here `there is no clear indication of retroactive application, then the statute may only apply to cases which arise subsequent to its enactment.' Id. at 106, quoting Kiser v.Coleman (1986), 28 Ohio St.3d 259, 262. This quotation disposes of appellant's initial argument that the statute is not retroactive because the trial was not yet held. Rather, an attempt to apply a newly enacted or amended statute to a case that arose before the statute's enactment or amendment is an attempt to apply the statute retroactively, even if the trial has not yet taken place. It is a retroactive application if an amendment is applied to a case which arose prior to enactment. Id.
 {¶ 144} Thus, we must now determine whether the legislature clearly expressed an intent to apply R.C. 1343.03(C)(2) retroactively. In support of his claim of a clear legislative intent, appellant cites the uncodified law in § 3 of the amendment to the statute. This uncodified law speaks to the application of R.C. 1343.03(A) and does not mention the remaining divisions of the statute. R.C. 1343.03(A) previously set a prejudgment interest rate of ten percent per annum. The amendments, effective June 2, 2004, changed division (A) so that the interest rate is now a variable rate determined pursuant to R.C. 5703.47. The uncodified law accompanying this amendment provides as follows:
 {¶ 145} "The interest rate provided for in division (A) of section 1343.03 of the Revised Code, as amended by this act, applies to actions pending on the effective date of this act. In the calculation of interest due under section 1343.03 of the Revised Code, in actions pending on the effective date of this act, the interest rate provided for in section 1343.03 of the Revised Code prior to the amendment of that section by this act shall apply up to the effective date of this act, and the interest rate provided for in section 1343.03 of the Revised Code as amended by this act shall apply on and after that effective date."
 {¶ 146} As appellee points out, this passage only establishes an intent to make the interest rate of division (A) retroactive (partially retroactive to pending actions). It specifically made the new interest rate applicable to this pending case from the date of the amendment's effective date and allowed the ten percent rate to still be applied when calculating the per annum rate prior to the amendment's effective date.
 {¶ 147} Contrary to appellant's contention, it expresses no intent to make amendments to other divisions retroactive. In fact, the mere existence of this passage mentioning only division (A) is a contraindicator of legislative intent to make other divisions retroactive.
 {¶ 148} If a statute is silent as to whether it has retroactive application, it can only be applied prospectively.State v. Williams, 103 Ohio St.3d 112, 2004-Ohio-4747, ¶ 9. The expressed legislative intent must be clear. Id. at ¶ 8. Clear intent is expressed by words such as "retroactive," "retrospective" or "applies to pending cases." See Van Fossen,36 Ohio St.3d at 106; Nichols v. Villarreal (1996),113 Ohio App.3d 343, 348.
 {¶ 149} Here, there is no clearly expressed intent in the statute that the amendment, stating that prejudgment interest cannot be awarded for future damages, is to be applied retroactively to all pending cases. Thus, pending litigants are not barred from collecting prejudgment interest on all damages as was allowed at the time they filed their action. As such, this argument is overruled.
 SUBASSIGNMENT OF ERROR NUMBER THREE {¶ 150} Prejudgment interest must be awarded if: (1) a timely motion is filed, (2) a hearing is held, (3) the court finds that the party required to pay the judgment failed to make a good faith effort to settle; and, (4) the court finds that the party to whom the judgment is to be paid did not fail to make a good faith effort to settle the case. Moskovitz v. Mt. Sinai Med.Ctr. (1994), 69 Ohio St.3d 638, 658. Here, appellant claims that prejudgment interest was not warranted because the trial court erred in finding the third element, that he failed to make a good faith effort to settle.
 {¶ 151} The court's decision on whether the defendant made a good faith effort to settle is reviewable only for an abuse of discretion. Id. The Supreme Court has defined good faith effort to settle in the negative by stating that a party has not failed to make a good faith effort to settle if he has: (1) fully cooperated in discovery proceedings; (2) rationally evaluated his risks and potential liability; (3) not attempted to unnecessarily delay any of the proceedings; and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. Id. at 658-659, reaffirming Kalain v. Smith
(1986), 25 Ohio St.3d 157.
 {¶ 152} The Court also stated: "If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer." Id. at 659. The court warned, however, that this sentence caused some difficulty since it was made in Kalain and should be strictly construed so as to carry out the purposes of R.C. 1343.03(C). Id.
 {¶ 153} The burden is on the party seeking prejudgment interest, but that party need not show bad faith, which has been distinguished from a lack of good faith effort to settle. Id. The court can consider the nature of the case, the injuries, the applicable law, any defenses available, responses or lack of responses, and the nature, scope and frequency of efforts to settle. See id.
 {¶ 154} Appellant breaks his argument into the four parts of the definition of a good faith effort to settle. First, appellant urges that he fully cooperated in the discovery proceedings. He claims that merely because the January 1999 panoramic x-ray was missing does not mean that he failed to cooperate. The court found that appellant failed to fully cooperate in discovery because of the still missing panoramic x-ray and because appellant refused to turn over appellee's original periapical x-ray as requested by appellee's counsel for his expert's review. The court noted that appellee was forced to seek court intervention to obtain this x-ray. The court also noted that despite numerous pretrials before the first trial, appellant did not stipulate to breach until the day of trial.
 {¶ 155} Appellant opines that the court's finding on this element is unreasonable, arbitrary or unconscionable. However, it is the court's consideration of all factors together that results in a discretionary decision on whether the defendant made a good faith effort to settle the case. Thus, we must continue to assemble the factors.
 {¶ 156} Second, appellant claims that he did not cause undue delay. The court again referred to the refusal to produce the original periapical x-rays in discovery. Then, the court noted that after this court affirmed the trial court's grant of a new trial, appellant filed an untimely appeal in the Ohio Supreme Court. Despite the untimeliness, appellant indicated his belief at a pretrial that the Supreme Court would take the case and therefore said there would be no settlement discussions.
 {¶ 157} The court pointed out that appellant filed a motion to disqualify the judge in the common pleas court rather than the proper forum of the Supreme Court, where it sat for four months without any action. Then, appellant finally refiled the Affidavit of Disqualification in the Supreme Court a month before trial even when the actions complained of took place months previously. The court concluded that this procedure delayed the court's rulings on various pretrial motions and set back the impaneling of a jury.
 {¶ 158} The court then explained that one week before trial, appellant sought reconsideration of a ruling (barring an expert not disclosed before the deadlines of the first trial) made during a pretrial six months prior. Appellant then appealed the court's oral refusal to reconsider the discovery order, which caused some delay while this court determined that there was no final appealable order.
 {¶ 159} Then, lead counsel failed to show up for the remainder of voir dire as scheduled on the second day of trial at 10:00 a.m. He reportedly was heading toward Toledo instead of Youngstown on the Ohio Turnpike. During voir dire, the court received an application for a writ of mandamus filed by appellant in this court, which delayed the proceedings further.
 {¶ 160} The court then revealed that although the court had ordered that Dr. Carlson was not permitted to testify at the pretrial, appellant still flew him in from Tennessee and called him to the stand. The court had to remove the jurors to deal with the issue. It is not unreasonable, arbitrary or unconscionable for the court to determine that appellant unnecessarily caused some delay. Still, we must continue our evaluation of all factors.
 {¶ 161} Third, appellant claims that he rationally evaluated the risks and liabilities. Appellant relies on the fact that he already tried the case and received a jury verdict in his favor. He states that there was convincing expert testimony on both sides. The court found that this argument disregards its decision to grant a new trial on the grounds that the jury verdict was against the weight of the evidence and disregards the appellate court's decision affirming that judgment. The trial court also pointed out that appellant stipulated to his breach of duty. And, the court noted the critical admission of appellant's expert, Dr. Li, that there was dramatic growth between October 1998 and April 1999 and that appellant's breach at least caused the additional loss of one or two teeth.
 {¶ 162} In fact, the testimony of the insurer's vice president of claims at the prejudgment interest hearing stated that if Dr. Li indeed gave this opinion, then he probably would have made an offer before the second trial. Thus, the decision-makers at the insurer were not even aware of the unfavorable effect of Dr. Li's testimony despite two court decisions pointing out this factor. The trial court explained that this proximate cause admission had a monetary value. The court then concluded that it was unreasonable to disregard these factors and place complete reliance on obtaining a second defense verdict merely upon the voided result of the first trial.
 {¶ 163} Before reaching the fourth factor, appellant contends that he had a good faith, objectively reasonable belief that he had no liability and thus was not required to make a settlement offer. See Moskovitz, 69 Ohio St.3d at 658-659 (but noting that the exception should be strictly construed to accomplish the purpose of R.C. 1343.03(C)). This ties in with whether appellant rationally evaluated his risks and liabilities supra. For the reasons stated within that factor, the trial court did not abuse its discretion in finding that appellant did not have a good faith, objectively reasonable belief that he would not be subject to liability. Two courts already held that due to the opinion of his own expert, he was subject to some liability.
 {¶ 164} Lastly, appellant claims that he made a good faith monetary settlement offer. Again, part of this analysis is also tied to the evaluation of risks and liabilities factor. Before the first trial, appellant offered $300,000 to settle the case. In determining that appellant failed to make a good faith effort to settle, the court focused on its determination that after the trial court determined that the first verdict for appellant was against the manifest weight of the evidence and this appellate court affirmed, appellant made no settlement offer. The court pointed out that appellee made a settlement demand on May 17, 2004, more than five months prior to trial, in the amount of $400,000, but appellant did not respond.
 {¶ 165} There are two issues here. First, appellant urges that the court should not have disregarded his $300,000 settlement offer prior to the first trial. Apparently, appellant believes that a good faith monetary offer at that time saves him from having to make another offer prior to the retrial, even though that offer was no longer on the table. We also note that substantial disparity between the verdict and the offer can be considered as one factor, albeit it cannot be the only or main factor. See Andre v. Case Design, Inc., 154 Ohio App.3d 323,2003-Ohio-4960, ¶ 15. Here, the jury verdict was $800,000, the offer prior to the first trial was $300,000 and the offer prior to the retrial was zero dollars.
 {¶ 166} The trial court could reasonably find that appellant failed to rationally evaluate the risk of a plaintiff's verdict in the retrial. An offer should have been made before the retrial. There were new risks to consider, including the fact that appellant's main expert had previously admitted that appellant caused some damage. A realistic assessment of the case was required. Appellant failed to take into account the strengths and weaknesses of the evidence in this case.
 {¶ 167} Next, appellant claims that the court improperly refused to consider settlement discussions made during mediation because they are confidential. (Tr. 121, 197-198). Appellant states that during mediation, he made a high-low offer of $100,000 for a defense verdict and $300,000 for a plaintiff's verdict. (This evidence was not before the court due to the court's ruling on mediation's confidentiality.)
 {¶ 168} According to the statute in effect at the trial (but since repealed), a mediation communication is "a communication made in the course of and relating to the subject matter of a mediation." R.C. 2317.023(A)(2). The statute then provided that a mediation communication is confidential. R.C. 2317.023(B). And, the statute continued: "no person shall disclose a mediation communication in a civil proceeding or in an administrative proceeding." Id.
 {¶ 169} However, the statute contained exceptions. For instance, the confidentiality provision does not apply if the parties consent to disclosure or a court, after a hearing, determines that the disclosure does not circumvent Evidence Rule 408 [evidence of offer to compromise is not admissible to prove liability for or invalidity of the claim or its amount], that the disclosure is necessary in the particular case to prevent a manifest injustice, and that the necessity for disclosure is of sufficient magnitude to outweigh the importance of protecting the general requirement of confidentiality in mediation proceedings. R.C. 2317.023(C)(2), (4).
 {¶ 170} Yet, we must point out that appellant does not rely on or even mention this exception. Rather, he attempts to make common sense arguments such as using the confidentiality requirement to prohibit evidence that they in fact did make a settlement offer is akin to suing for malpractice and then trying to bar the defendant from testifying based upon doctor-patient privilege.
 {¶ 171} The necessity for disclosure of a settlement offer where the plaintiff claims that there was no settlement offer appears to be of sufficient magnitude to outweigh any reasons for confidentiality, could often be required to prevent a manifest injustice and would not circumvent Evid.R. 408. Furthermore, making a motion for prejudgment interest can be construed as implied consent to disclose that a settlement offer was made during mediation. As such, a court presiding over a prejudgment interest hearing should not automatically bar testimony to show that a settlement offer was made just because that offer was made during mediation.
 {¶ 172} However, this conclusion does not affect the propriety of the court's decision under the facts of this case. Notably, the mediation and resulting offer here took placeafter the second trial. (Tr. 119-120). Thus, appellee still had to go through an entire week long trial (from October 25 through November 1) and still had to incur the expenses involved in such a detailed trial. After enduring an entire trial and evaluating the testimony presented, the rationale for settlement is wholly different. That is, the purpose of encouraging settlement to avoid expending court time and judicial resources is destroyed. See Kalain, 25 Ohio St.3d at 159 ("The statute was enacted to promote settlement efforts, to prevent parties who have engaged in tortious conduct from frivolously delaying the ultimate resolution of cases, and to encourage good faith efforts tosettle controversies outside a trial setting" (emphasis added)).
 {¶ 173} Timing of the offer is a relevant consideration. SeeMoskovitz, 69 Ohio St.3d at 659. See, also, Borucki v.Skiffey, 11th Dist. Nos. 2000-T-29, 2000-T-57, 2001-Ohio-4340 (majority noting that after all missed pretrial opportunities and other factors, offer made one week before trial cannot save defendant from prejudgment interest; dissent stating that although a "courthouse steps" settlement offer would likely not avoid the risk of prejudgment interest, one week before trial is acceptable). Considering the facts of this case, waiting until after closing arguments to make a high-low settlement offer does not constitute a good faith monetary settlement offer. (As the trial court pointed out, appellant failed to respond to appellee's settlement demand of $400,000 five months before trial, and the insurer testified to having an indemnity reserve of $325,000 set aside for this trial.) Thus, any error in excluding testimony on the post-trial offer at the prejudgment interest hearing is harmless.
 {¶ 174} Furthermore, as aforestated, the four factors considered in evaluating a good faith effort to settle are to be weighed together. The Supreme Court set forth the definition in the negative, meaning that if all factors are satisfied, then the party did not fail to make a good faith effort. Thus, merely because one factor is satisfied does not mean prejudgment interest is unwarranted. Here, the court did not abuse its discretion in finding that after weighing all four factors and all relevant considerations, appellant failed to make a good faith effort to settle this case. This subassignment is overruled.
 {¶ 175} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Donofrio, P.J., concurs.
DeGenaro, J., concurs.