OPINION
{¶ 1} Defendants-appellants, Dr. Lloyd Slusher, Community Medical Corporation d.b.a. The Breast Care Center, and Medical Ultrasound, Inc., appeal from a Mahoning County Common Pleas Court judgment in favor of plaintiff-appellee, Richard Burton individually and as the executor of the estate of Cynthia Burton, following a jury trial on his wrongful death claim.
 {¶ 2} Cindy Burton had been on a cholesterol-lowering drug that required routine blood tests to monitor her liver function. In December 2002, her tests came back abnormal. This prompted her primary care physician to order a CAT scan of her liver. The CAT scan revealed cancer.
 {¶ 3} Cindy was diagnosed with liver cancer in January 2003. Further tests revealed that the cancer originated in her right breast and metastasized to her liver. By the time the cancer was detected, Cindy's condition was terminal.
 {¶ 4} Cindy underwent routine mammograms on July 18, 2000, October 16, 2001, and November 7, 2002. Dr. Slusher was the radiologist who interpreted Cindy's mammograms. Dr. Slusher's professional organization includes Community Medical Corporation d.b.a. The Breast Care Center and Medical Ultrasound, Inc.
 {¶ 5} Dr. Slusher did not detect any abnormalities with Cindy's mammograms. However, after she was diagnosed with cancer, her earlier mammograms were reviewed by others. It was opined that while her July 2000 mammogram was normal, Cindy's October 2001 and November 2002 mammograms revealed abnormalities that would have required further testing, which would have revealed that she had breast cancer.
 {¶ 6} Cindy died of complications from cancer on June 25, 2004.
 {¶ 7} Appellee filed wrongful death and medical malpractice claims against appellants on February 11, 2005. Appellee alleged that had Dr. Slusher properly interpreted Cindy's 2001 and 2002 mammograms and sent her for further tests, Cindy's cancer would have been caught before it metastasized to her liver and she would have survived.
 {¶ 8} The matter proceeded to a jury trial on May 29, 2007. On the day of *Page 2 
trial, Dr. Slusher admitted that he negligently interpreted Cindy's mammograms of October 2001 and November 2002. However, he maintained that he did not cause death or injury to Cindy because her cancer was so advanced by October 2001, that his misinterpretation of the mammograms made no difference in her ultimate outcome. The court read an agreed statement to the jury advising them as such. The trial proceeded on the issues of proximate cause and damages.
 {¶ 9} Appellee presented expert testimony that had Dr. Slusher properly interpreted Cindy's 2001 mammogram, her cancer would have been diagnosed at that time. Appellee's expert testimony further indicated that if Cindy's cancer had been detected in 2001 it would have been only in her breast and would not have metastasized to her liver. Appellee's expert further testified that Cindy would have been treated for breast cancer and would have had a great likelihood of survival.
 {¶ 10} Appellants presented expert testimony that even if Dr. Slusher had properly interpreted Cindy's 2001 mammogram, her outcome would have been the same because the cancer had already metastasized to her liver by then.
 {¶ 11} The jury rendered a verdict in favor of appellee in the amount of $750,000.
 {¶ 12} Appellants subsequently filed a motion for a new trial. They argued that since Dr. Slusher admitted that he negligently misinterpreted Cindy's mammograms, the trial court should not have permitted appellee's counsel to repeatedly make statements and present evidence as to Dr. Slusher's deviation from the standard of care. Additionally, appellants argued that the trial court should have excused for cause a juror whose wife had breast cancer. The trial court denied this motion.
 {¶ 13} Appellee filed a motion for prejudgment interest. He argued that while he made a good faith effort to settle the case, appellants failed to make a good faith effort to settle and, therefore, he was entitled to prejudgment interest. The trial court agreed. It granted the motion and awarded appellee $303,793.50 in prejudgment interest. *Page 3 
 {¶ 14} Appellants filed a timely notice of appeal on August 20, 2007.
 {¶ 15} Appellants raise four assignments of error, the first of which states:
 {¶ 16} "THE TRIAL COURT ABUSED ITS DISCRETION BY PERMITTING APPELLEE'S COUNSEL TO ELICIT TESTIMONY, ADMIT EVIDENCE, AND MAKE STATEMENTS REGARDING DR. SLUSHER'S DEVIATION FROM THE STANDARD OF CARE WHEN DR. SLUSHER STIPULATED TO THE DEVIATION PRIOR TO THE COMMENCEMENT OF TRIAL."
 {¶ 17} During voir dire, the trial court read an agreed statement to the potential jurors. The statement provided in part:
 {¶ 18} "Dr. Slusher, he admits that he negligently interpreted the mammograms of October 16, 2001 and that of November 7, 2002. And that he should have ordered additional studies that probably would have demonstrated breast cancer. Dr. Slusher, however, claims that he did not cause any injury or the death of Cynthia Burton and that her cancer was already so advanced by October of 2001 that his misinterpretation made no difference in the outcome." (Tr. 35-36).
 {¶ 19} Appellants argue that since they stipulated to Dr. Slusher's deviation from the standard of care, the court should not have permitted appellee to introduce any evidence on this subject and to comment on it in opening statements and closing arguments. They contend that appellee's evidence should have been limited to whether Dr. Slusher proximately caused Cindy's death.
 {¶ 20} Appellants argue that appellee's reason for presenting comments and evidence as to Dr. Slusher's breach of the standard of care was merely to "inflame the passion and prejudice of the jury." They contend that allowing appellee to continually bring up negligence after it was stipulated provoked the jury to punish Dr. Slusher instead of determining whether his negligence was the proximate cause of Cindy's death.
 {¶ 21} Appellants assert that even if the negligence evidence was relevant, the court should have excluded it pursuant to Evid. R. 403(A), because the probative value of the evidence was outweighed by the danger of unfair prejudice and *Page 4 
confusion of the issues.
 {¶ 22} Finally, appellants assert that they were not required to object every time appellee asked a question about Dr. Slusher's negligence. They contend that the two objections they did raise, one during appellee's opening statement and the other during Dr. Marc Homer's testimony, relieved them of objecting every time the issue came up and preserved the issue for review on appeal.
 {¶ 23} Appellants take issue with five separate instances. We will address each one in turn.
 {¶ 24} First, during opening statements, appellee's counsel told the jury that Cindy asked her oncologist to give her mammograms to someone to determine whether the cancer "had been missed." (Tr. 250). Appellants objected on the basis of hearsay and the court overruled the objection. (Tr. 250). Appellee's counsel further told the jury that the cancer had been missed. (Tr. 250). And counsel later told the jury that Dr. Slusher did not stipulate to negligence until the morning of trial. (Tr. 257). Appellants did not object to this statement.
 {¶ 25} Trial counsel is accorded wide latitude in opening statements subject to the restriction that counsel may not comment on incompetent, inadmissible, or improper evidence. Presley v. Hammack, 7th Dist. No. 02-JE-28, 2003-Ohio-3280, at ¶ 33.
 {¶ 26} Here, appellee's counsel was merely setting out the facts for the jury. The statements counsel made were true and were supported by the evidence later presented at trial. Furthermore, appellants' only objection was to the first comment and it was simply on the basis of hearsay. Appellants did not object to the comments on the basis that they dealt with a stipulated issue. Thus, they waived such an objection for purposes of appeal.
 {¶ 27} The second issue that appellants take issue with dealt with the direct testimony of radiologist Dr. Marc Homer. Appellee's counsel asked Dr. Homer to review the 2001 mammogram and explain why he disagreed with Dr. Slusher's interpretation. (Tr. 317). Appellants objected on the basis that they had admitted *Page 5 
negligence. (Tr. 317). The court overruled the objection. (Tr. 317). Dr. Homer then gave his opinion on what the mammogram revealed. (Tr. 317-23). Appellee's counsel asked Dr. Homer to explain why he disagreed with Dr. Slusher's interpretation of the 2002 mammogram. (Tr. 330). This time appellants did not object. Counsel also asked Dr. Homer whether his findings were a "close call," to which he responded "no." (Tr. 322). Again, appellants did not object. Additionally, appellee's counsel asked Dr. Homer about the timing of Dr. Slusher's admission to negligence, given the fact that in his deposition Dr. Slusher denied any negligence whatsoever. (Tr. 332-34). Again, appellants did not object.
 {¶ 28} Appellee relies heavily on this court's decision inScibelli v. Pannunzio, 7th Dist. No. 05-MA-150, 2006-Ohio-5652. In that case, Scibelli's dentist, Dr. Pannunzio, failed to timely diagnose Scibelli's jaw tumor. Scibelli required major oral surgery and lost nine teeth. Scibelli sued Dr. Pannunzio. Dr. Pannunzio admitted he breached the standard of care and the matter went to trial on the issues of proximate cause and damages. The jury returned a verdict in favor of Scibelli. Dr. Pannunzio appealed arguing, among other things, that the trial court erred in permitting Scibelli to comment on and offer evidence regarding the standard of care. He argued that such references and evidence were prejudicial and inflammatory.
 {¶ 29} Dr. Pannunzio took issue with the questioning of three witnesses. Dr. Pannunzio did not enter objections to two of these witnesses' testimony. We held: "Objections to a line of questioning regarding particular witnesses must be entered to preserve the issue. Thus, any such issues are waived." Id. at ¶ 48. Dr. Pannunzio did object to the third witness's testimony when the testimony touched upon standard of care issues and criticized Dr. Pannunzio's care of Scibelli. The witness then testified regarding the acceptable standard of care and that Dr. Pannunzio breached this standard of care.
 {¶ 30} Dr. Pannunzio relied on the case of Johnson v. Knipp (1973), 36 Ohio App.2d 218, 221-22, 304 N.E.2d 914, where the court determined that the plaintiff could not introduce evidence of the defendant's intoxication at the time of the *Page 6 
accident. In distinguishing Johnson, we stated:
 {¶ 31} "We do not find Johnson persuasive due to the factual dissimilarities of that case with this case. Evidence of a defendant's intoxication (i.e. an inflammatory explanation of why he caused the accident) differs from mere testimony that the defendant caused an accident and various details of the accident that help illustrate the background of the case. It certainly differs from testimony on the symptoms of a tumor in the jaw and how a black spot should have resulted in a larger x-ray or a referral. The defendant in Johnson stipulated to complete negligence, including proximate cause. Here, only duty and breach were admitted, and proximate cause was still at issue. As appellee explains, some of the proximate cause issues were hard to extract from the standard of care issues. Thus, this case is distinguishable, not to mention not binding." Scibelli, at ¶ 52.
 {¶ 32} Scibelli went on to argue that in order to understand proximate cause and damages, the jury needed to know when and how Dr. Pannunzio was negligent. We agreed and reasoned:
 {¶ 33} "As appellee notes, his case was based upon the theory that the earlier the diagnosis was made, the less deformity he would have suffered. The location and growth of the tumor at various points in thecourse of treatment were key aspects of the case. The multiple breachesin the standard of care from October through April are inextricablyintertwined with the issues of proximate cause and damages. Due to the direct correlation between the timing of the negligent act and the extent of damages with standard of care issues, most of the objected to testimony related to standard of care was relevant and admissible." (Emphasis added). Id. at ¶ 54.
 {¶ 34} We then concluded:
 {¶ 35} "And, even if some isolated statements may have gone into the stipulated standard of care issue more than necessary, prejudice is not apparent here, as it may be in a case where evidence of a defendant's intoxication or drug use is admitted." Id. at ¶ 56. *Page 7 
 {¶ 36} In the present case, Dr. Homer initially testified that as a radiologist, it is important to look at prior mammograms in making interpretations. (Tr. 301-302). He stated that this is because noticing changes from one mammogram to the next can indicate the presence of cancer. (Tr. 302). Dr. Homer later explained that one of the main things he looks for when interpreting a mammogram is microcalcifications. (Tr. 311-12). Microcalcifications can be indicative of cancer. (Tr. 312-13).
 {¶ 37} Dr. Homer then went through a detailed explanation of what he saw in Cindy's mammograms from 2000, 2001, and 2002. (Tr. 314-36). He stated that the 2000 mammogram was normal, with no suspicious microcalcifications. (Tr. 314). He stated that this was also Dr. Slusher's opinion of the 2000 mammogram and that he agreed with Dr. Slusher as to this mammogram. (Tr. 315). Dr. Homer further testified that he did not agree with Dr. Slusher's finding that the 2001 mammogram was normal. (Tr. 317). The 2001 mammogram along with the 2000 mammogram were displayed for the jury. Dr. Homer pointed out where a new area of microcalcifications had developed that was not present on the 2000 mammogram. (Tr. 318). He described them as tiny white dots. (Tr. 318). Dr. Homer stated that these microcalcifications did not have the characteristics of being benign. (Tr. 320-21). Additionally, Dr. Homer stated that the 2001 mammogram did not reveal a mass. (Tr. 327). This was a "pertinent negative" at the time. (Tr. 327). The fact that there was no mass was significant because once a mass has appeared, it is more likely that the cancer has spread beyond the duct and has become invasive. (Tr. 328). Dr. Homer opined that in the majority of cases where microcalcifications are present in an area measuring less than one-half an inch and where no mass is present, more likely than not the cancer is intraductal as opposed to invasive. (Tr. 329). The area of Cindy's microcalcifications in 2001 was two-fifths of an inch. (Tr. 329-30).
 {¶ 38} Dr. Homer testified that if these microcalcifications had been recognized in 2001, a diagnostic mammogram would have been ordered in order to confirm the microcalcifications and pinpoint where a biopsy should be performed. *Page 8 
(Tr. 323-25). Dr. Homer stated that Cindy absolutely should have been called back for a diagnostic mammogram in 2001 and that he was 95 percent certain that the diagnostic mammogram would have revealed the location of the microcalcifications. (Tr. 326). Dr. Homer opined that a biopsy in 2001 would have revealed breast cancer. (Tr. 332).
 {¶ 39} The 2001 and 2002 mammograms were then displayed for the jury. Dr. Homer pointed out the differences between the two. (Tr. 330-31). He testified that a dramatic change had occurred. (Tr. 331). He stated that a new area of microcalcifications had developed. (Tr. 331). He further stated that area of microcalcifications had grown a half a centimeter. (Tr. 329, 331). And he opined that a mass had developed. (Tr. 330-31).
 {¶ 40} Dr. Homer then compared Cindy's 2002 mammogram with a mammogram she had in 2003, after cancer was already suspected. Dr. Homer pointed out that by this time Cindy had developed a lump that she could feel. (Tr. 335). He believed the lump to be 1.7 centimeters by then. (Tr. 335).
 {¶ 41} Finally, Dr. Homer testified that the changes from one mammogram to the next demonstrated the evolutionary process of untreated breast cancer. (Tr. 336). He summarized the following. In the first mammogram everything was normal. (Tr. 336). In 2001, new microcalcifications were present. (Tr. 336). In 2002, there was an area of new density. (Tr. 336). And then a few months later, a lump was palpable. (Tr. 336).
 {¶ 42} Similar to the plaintiff in Scibelli, appellee's theory in this case was that the earlier the breast cancer diagnosis was made, the greater the likelihood that Cindy would have survived. And as was the case in Scibelli, the issue of standard of care was intertwined with the issue of proximate cause. The best way for Dr. Homer to explain to the jury how Cindy's cancer progressed and explain why, if it had been diagnosed in 2001, Cindy would have survived was to go through each mammogram and explain the changes he saw from one mammogram to the next. The changes from the 2000 mammogram to the 2001 mammogram to the 2002 mammogram *Page 9 
were significant in this case and formed the basis of demonstrating proximate cause. As the number of microcalcifications grew and turned into a mass, Cindy's chances of beating the cancer lessened. And as the mass became a palpable lump, Cindy's chances of beating the cancer lessened even more.
 {¶ 43} Appellants argue that this case is distinguishable fromScibelli and instead is more like Telxon Corp. v. Smart Media ofDelaware, Inc., 9th Dist. Nos. 22098, 22099, 2005-Ohio-4931. InTelxon, SMI, seeking to develop a computerized device for use in grocery shopping, brought breach of contract and tort actions against Telxon with which SMI had discussed a proposed joint venture. Prior to trial, SMI dismissed their claim for misappropriation of trade secrets. However, at trial, the court allowed SMI to dwell on the alleged misappropriation. Telxon argued on appeal that the jury relied on these statements to its prejudice by finding in SMI's favor on its other claims. The Ninth District agreed. It found:
 {¶ 44} "The fact is that SMI and Dupre had dismissed their misappropriation claim, and therefore, it was not properly before the court and not susceptible to pre-planned defense by Telxon. Yet, SMI and Dupre made this claim the centerpiece of their case; they routinely and repeatedly questioned witnesses about it, introduced extensive evidence regarding patents and secrets, and Dupre's attorney committed fully half of his closing argument to it." Id. at ¶ 122.
 {¶ 45} The court also found that this information clearly prejudiced the jury. It based this conclusion on jury interrogatories where the jury unanimously found that SMI provided confidential information to Telxon that included SMI's patent application and business plan. Id. at ¶ 123. The court concluded:
 {¶ 46} "Viewing the three-week trial as a whole, it is reasonable to infer that the extensive evidence, argument, testimony and questioning about this non-issue had the effect of confusing and misleading the jury." Id. at ¶ 125.
 {¶ 47} This case is distinguishable from Telxon. First, inTelxon, the plaintiff dismissed a claim and then, at trial, harped on the very issue it dismissed. As the appellate court noted, this put the defendant at a significant disadvantage because it *Page 10 
was not prepared to defend on this issue. In the case at bar, however, it was the defendant who stipulated to negligence on the day oftrial. By this time both sides had prepared to present the issue to the jury. Second, there were no jury interrogatories in this case that demonstrated that the jury was confused or misled by the standard of care evidence. Thus, there is no evidence of prejudice in this case as was the case in Telxon. Finally, this is a medical malpractice action. Here, we are dealing with one claim where the issues of standard of care and proximate cause were intertwined together, not separate causes of action that have no bearing on each other as in Telxon. Thus,Telxon is not persuasive here.
 {¶ 48} Appellants also cite to numerous cases where it was found that the trial courts erred in allowing the plaintiffs to introduce "inflammatory" evidence where the defendant stipulated negligence. However, most of these cases involved instances where the defendant was intoxicated and caused an accident and the plaintiff introduced evidence regarding the intoxication. As we discussed in Scibelli, this type of case is distinguishable since evidence of a defendant's intoxication differs from mere testimony that the defendant caused an accident and various details of the accident that help illustrate the background of the case. Scibelli, at ¶ 52.
 {¶ 49} Furthermore, during opening statements, appellants' counsel repeatedly reminded the jury that Dr. Slusher admitted that he made a mistake in interpreting the mammograms in an attempt to promote Dr. Slusher's credibility. This trend continued throughout the trial. By bolstering Dr. Slusher's credibility, appellants essentially put Dr. Slusher's credibility and the credibility of his defense as a main issue in this case.
 {¶ 50} Thus, Dr. Homer's testimony regarding the standard of care was admissible in this case because it was entangled with the issue of proximate cause, it was relevant in demonstrating appellee's theory of how Dr. Slusher's negligence was the proximate cause of Cindy's death, and appellants placed Dr. Slusher's credibility at issue.
 {¶ 51} The third issue appellants raise here concerns the testimony of Cindy's *Page 11 
oncologist, Dr. Eric Chevlen. During his testimony, Dr. Chevlen stated that he gave Cindy's 2002 mammogram to his radiologist who opined that the cancer was apparent then. (Tr. 384). Dr. Chevlen testified that he shared this information with the Burtons in February 2004. Appellants did not object to this testimony.
 {¶ 52} Because appellants did not object to this line of questioning with this particular witness, we can consider the issue waived on appeal. See Scibelli, at ¶ 48.
 {¶ 53} Furthermore, as appellee points out, when Dr. Chevlen testified, appellee still had a survivorship claim pending. At the close of appellee's case, appellants made a motion for a directed verdict on this claim arguing that appellee failed to file it within the one-year statute of limitations. (Tr. 498). Appellee countered by arguing that the statute of limitations did not begin to run until Cindy learned that her mammogram had been misinterpreted, which occurred when Dr. Chevlen had his radiologist read the mammogram in February 2004. (Tr. 502). The trial court ultimately dismissed this claim. However, at the time appellee's counsel questioned Dr. Chevlen about the timing of when the radiologist concluded that Cindy's mammogram had been misread, the survivorship claim was pending and the main issue was whether appellee had filed this claim within the statute of limitations. Thus, testimony regarding when Cindy first learned about her misread mammogram had the potential to be highly relevant in determining when the statute of limitations began to run on the survivorship claim. Thus, it was not error to allow such testimony.
 {¶ 54} Appellants' fourth issue here surrounds Dr. Slusher's testimony. Appellants called Dr. Slusher to the stand. Dr. Slusher explained his position as to why he just recently determined that he misinterpreted the mammograms. (Tr. 520-21). Appellee's counsel then questioned Dr. Slusher regarding why he changed his mind on the subject of his negligence on the day of trial. (Tr. 523-29). Appellants did not object to these questions.
 {¶ 55} Once again, because appellants did not object to this line of questioning as to this particular witness, they have waived review of the issue on *Page 12 
appeal. See Scibelli, at ¶ 48.
 {¶ 56} Moreover, by this time, Dr. Slusher had already testified about why he changed his position and admitted that he misinterpreted the mammograms. Appellee was permitted to cross-examine him on the subject.
 {¶ 57} Appellants' final issue in this assignment of error concerns closing arguments. During closing arguments, appellee's counsel pointed out to the jury that Dr. Slusher's reports for all three of Cindy's mammograms were identical. (Tr. 809-810). Counsel then asked the jury, "Did he even look at them?" (Tr. 810). Appellants did not object.
 {¶ 58} Counsel is afforded great latitude in closing arguments and the determination of whether counsel exceeded the bounds of permissible argument is, in the first instance, within the trial court's discretion.Pesek v. Univ. Neurologists Assn., Inc., 87 Ohio St.3d 495, 501,721 N.E.2d 1011. It is only when counsel engages in "gross and abusive conduct" that the trial court is required to, sua sponte, correct counsel's misconduct. Id., quoting Snyder v. Stanford (1968),15 Ohio St.2d 31, 37, 238 N.E.2d 563, superseded by rule on other grounds as stated in Gable v. Gates Mills, 103 Ohio St.3d 449, 816 N.E.2d 1049,2004-Ohio-5719, at ¶ 40.
 {¶ 59} In Scibelli, Dr. Pannunzio argued that the trial court erred in permitting Scibelli's counsel to make prejudicial comments during closing arguments. As to one such comment, we noted that Dr. Pannunzio did not object and, therefore, waived the issue for review.Scibelli, 7th Dist. No. 05-MA-150, at ¶ 100. In another comment, to which Dr. Pannunzio objected, counsel made reference to the fact that for much of the litigation, Dr. Pannunzio denied that he breached the standard of care. Then, after a certain expert was located, he changed his entire defense, admitted he breached the standard of care, and now argued that the breach was not the proximate cause of Scibelli's damages. On appeal, Scibelli argued that his counsel was merely recapping the un-objected to evidence that had been presented during trial. This court agreed and found, "[f]ailing to object (or seek redaction of allegedly irrelevant testimony) at a time when the issue could have been timely *Page 13 
addressed, waives any objection to recapping the information in closing arguments." Id. at ¶ 105.
 {¶ 60} Like Dr. Pannunzio, appellants here did not object to the comment that they now take issue with. On this ground alone, the issue is waived. Additionally, like Dr. Pannunzio, appellants did not object to the evidence regarding Dr. Slusher's breach of the standard of care during trial when the court could have addressed the issue. Thus, they have waived any objection to counsel's recap of the information in closing arguments. Furthermore, appellee's counsel made just one allegedly inappropriate comment during his entire closing argument. We cannot characterize this one comment as constituting "gross and abusive conduct" as is required for the trial court to sua sponte correct counsel's misconduct.
 {¶ 61} For all of the above reasons, appellants' first assignment of error is without merit.
 {¶ 62} Appellants' second assignment of error states:
 {¶ 63} "THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO EXCLUDE A PROSPECTIVE JUROR FOR CAUSE AFTER HE ACKNOWLEDGED THAT HE SHOULD NOT BE A JUROR IN A CASE INVOLVING BREAST CANCER BECAUSE HIS WIFE WAS RECENTLY DIAGNOSED WITH THE DISEASE."
 {¶ 64} Here appellants argue that the trial court should have excused for cause prospective juror Brown. During voir dire, Brown stated that his wife was a breast cancer survivor. Both parties questioned him about his experience with his wife's condition. Brown stated that he was very close to the issues in this case. (Tr. 193). It was noted for the record that Brown's lip quivered when talking about the subject. (Tr. 193). Appellants' counsel asked Brown if he believed that he was the best person to sit on the jury, to which he replied, "[p]robably not." (Tr. 193). Appellants challenged Brown for cause. (Tr. 193). The court then told Brown that it would not keep him as a juror if Brown did not think he could sit and listen to the evidence and decide the case on the evidence. (Tr. 193-94). However, Brown stated that he could listen to the court's instructions and decide the case on the *Page 14 
evidence. (Tr. 194-95). Therefore, the court did not excuse Brown for cause. (Tr. 195). Appellants then used a peremptory challenge and excused Brown. (Tr. 195).
 {¶ 65} Appellants argue that the court erred in failing to excuse Brown for cause and forcing them to use a peremptory challenge that they could have used for another potential juror. They assert that this was an arbitrary decision, and thus an abuse of discretion, because the trial court excused another prospective juror whose wife and daughter had breast cancer.
 {¶ 66} R.C. 2313.42 lists good causes for challenge to any person called as a juror. One cause is: "That he [the potential juror] discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." R.C. 2313.42(J).
 {¶ 67} Whether to disqualify a prospective juror for cause pursuant to R.C. 2313.42(J) is a discretionary function of the trial court. Berk v.Matthews (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301, at the syllabus. Thus, such a decision will not be reversed on appeal absent an abuse of discretion. Id. Abuse of discretion connotes more than an error of law; it implies that the trial court's judgment was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140.
 {¶ 68} The other person that appellants refer to was prospective juror Hudak. Hudak stated that his wife died from breast cancer and that his daughter was battling the disease. (Tr. 27-28). The court asked Hudak whether he thought he could be fair and impartial in this case. (Tr. 28). Hudak stated that while he hoped he could be fair and impartial, he did not know whether he could be. (Tr. 28). The court then asked Hudak if he wanted to be excused. (Tr. 29). Hudak said that he would rather be excused and the court excused him. (Tr. 29).
 {¶ 69} Additionally, the court excused prospective juror Besner. (Tr. 30). Besner informed the court that her mother died of cancer and she did not think she could sit as a juror. (Tr. 30). Besner asked to be excused. (Tr. 30).
 {¶ 70} Unlike prospective jurors Hudak and Besner, prospective juror Brown *Page 15 
did not ask to be excused. On the contrary, when asked whether there was any reason he could not or should not be a juror in this case, he responded, "no." (Tr. 181-82). Appellee's counsel then questioned him about his experience with his wife's battle against breast cancer. Counsel then asked him, even though this was an issue very close to his heart and soul, whether he could consider the evidence and decide the case based on the evidence. (Tr. 191). Brown stated that he could do that. (Tr. 191). Appellants' counsel then further questioned Brown. Counsel asked Brown if he thought that he was the best person to serve on the jury and he said, "probably not." (Tr. 193). The court then questioned Brown about his ability to be fair and impartial and to decide the case based on the evidence and the court's instructions. (Tr. 193-95). Brown indicated that he could do so. (Tr. 195).
 {¶ 71} The trial court did not abuse its discretion in deciding not to excuse Brown for cause. Brown initially indicated that there was no reason he should not or could not sit on the jury. Later, while he did state that he might not be the best person to sit on the jury, he nonetheless confirmed that he could listen to the evidence and instructions of law and be fair and impartial in this case. And unlike the other two jurors the court excused who had family experiences with cancer, Brown did not ask to be excused. Thus, the court's decision to keep Brown was not arbitrary as appellants suggest.
 {¶ 72} Accordingly, appellants' second assignment of error is without merit.
 {¶ 73} Appellants' third assignment of error states:
 {¶ 74} "THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPELLANTS' MOTION FOR NEW TRIAL."
 {¶ 75} Appellants argue that the trial court should have granted their motion for a new trial.
 {¶ 76} A trial court's decision granting or denying a new trial is reviewed for abuse of discretion. Koch v. Rist (2000),89 Ohio St.3d 250, 251, 730 N.E.2d 963.
 {¶ 77} In their motion, appellants argued that a new trial was warranted for the reasons they now set out in assignments of error one and two. For these same *Page 16 
reasons, appellants argue the court erred in denying their motion.
 {¶ 78} Because we have already reviewed appellants' first and second assignments of error and concluded that they are without merit, it follows that the court did not abuse its discretion in denying a new trial for these same reasons. Accordingly, appellants' third assignment of error is without merit.
 {¶ 79} Appellants' fourth assignment of error states:
 {¶ 80} "THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING APPELLEE'S MOTION FOR PREJUDGMENT INTEREST."
 {¶ 81} Appellants contend here that prejudgment interest was not warranted.
 {¶ 82} First, appellants argue that R.C. 1343.03(C), which governs prejudgment interest, is unconstitutional because it does not afford the defendant the right to have a jury decide whether to award or deny prejudgment interest.
 {¶ 83} On the other hand, appellee asserts that R.C. 1343.03(C) is constitutional citing Scibelli, 7th Dist. No. 05-MA-150, and Galayda v.Lake Hosp. Sys. Inc. (1994), 71 Ohio St.3d 421,644 N.E.2d 298.
 {¶ 84} As appellee points out, the Ohio Supreme Court has held that R.C. 1343.03(C) is constitutional and does not violate the right to a jury trial:
 {¶ 85} "R.C. 1343.03(C), which authorizes an award of prejudgment interest in a tort action against a defendant who failed to act in good faith to settle, does not violate either the Due Process Clause (Section 16, Article I) or the Right to Jury Trial Clause (Section 5, Article I) of the Ohio Constitution by imposing a penalty for exercise of that right." Galayda, 71 Ohio St.3d at paragraph two of the syllabus.
 {¶ 86} Appellants acknowledge the Court's holding, however, they contend that the Court failed to determine whether a defendant is entitled to have a jury weigh the evidence and determine whether prejudgment interest is warranted.
 {¶ 87} Appellants fail to recognize that the Galayda Court reasoned in part:
 {¶ 88} "Similarly, it is the jury's function to determine the amount of damages suffered by a plaintiff. Since determining the amount of prejudgment interest awards is entirely separate and distinct from determining the amount of damages suffered by *Page 17 
the plaintiff, and does not involve questions of fact, R.C. 1343.03 does not violate the fundamental constitutional right to trial by jury." Id. at 428.
 {¶ 89} This court acknowledged the Galayda Court's reasoning inScibelli where we noted that the Galayda Court "specifically opined that the right to have a jury determine damages is not violated by the prejudgment interest statute just because the judge makes findings on whether various factors exist." Scibelli, 7th Dist. No. 05-MA-150, at ¶ 123.
 {¶ 90} Thus, appellants' contention that R.C. 1343.03(C) is unconstitutional is unfounded.
 {¶ 91} Alternatively, appellants argue that they conducted themselves in good faith throughout this litigation. They contend that they rationally evaluated their risk and potential liability. They point out that they presented evidence from three qualified experts that although Dr. Slusher breached the standard of care, the cancer had already metastasized to Cindy's liver at the time she had the October 2001 mammogram. Appellants further assert that they made a good-faith effort to settle this case. They point out that on the first day of trial, they proposed a "high-low" agreement of $50,000/$500,000, which appellee rejected and countered with a $1,000,000 demand. Appellants state that they then offered $100,000, which appellee again rejected.
 {¶ 92} There are four requirements to an award of prejudgment interest: (1) a timely motion within 14 days after judgment; (2) a hearing on the motion; (3) the court must find that the party required to pay failed to make a good faith effort to settle; and (4) the court must find that the party the judgment is to be paid to did make a good faith effort to settle. Moskovitz v. Mt. Sinai Med. Ctr. (1994),69 Ohio St.3d 638, 658, 635 N.E.2d 331. If a party meets these four requirements, the court must award prejudgment interest.
 {¶ 93} The trial court has discretion, however, in determining whether a party acted in good faith or failed to make a good faith effort to settle. Id. If the record contains competent, credible evidence supporting the trial court's decision, there is *Page 18 
no abuse of discretion. Patterson v. Colla, 7th Dist. No. 03-MA-18,2004-Ohio-3033, at ¶ 44. The burden of proof is on the party seeking prejudgment interest. Moskovitz, at 659.
 {¶ 94} Lack of good faith is not the same as bad faith. Id. The Ohio Supreme Court has defined what constitutes lack of a good faith effort in the negative:
 {¶ 95} "A party has not `failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer." Kalain v. Smith (1986), 25 Ohio St.3d 157,495 N.E.2d 572, at the syllabus.
 {¶ 96} The Moskovitz Court added that the last sentence of theKalain syllabus should be strictly construed so as to carry out the purposes of R.C. 1343.03(C). Moskovitz, 69 Ohio St.3d at 659. The purposes of R.C. 1343.03(C) are "`to promote settlement efforts, to prevent parties who have engaged in tortious conduct from frivolously delaying the ultimate resolution of cases, and to encourage good faith efforts to settle controversies outside a trial setting.'" Id. at 658, quoting Kalain, at 159.
 {¶ 97} Given the above guidelines, we must consider whether the trial court abused its discretion in finding that appellants failed to make a good faith effort to settle this case. There is no allegation that appellants failed to cooperate in discovery or that they attempted to unnecessarily delay the proceedings. Thus, we must consider whether appellants rationally evaluated their risks and potential liability and whether they made a good faith settlement offer.
 {¶ 98} At the prejudgment interest hearing, it was revealed that appellee made a settlement demand of one million dollars, Dr. Slusher's medical malpractice policy limits, in April 2007. (PJI Tr. 25-26). A mediation was scheduled for April 30, 2007. *Page 19 
(PJI Tr. 26). Appellee sent a letter to appellants dated April 25, and enclosed a copy of the mediation statement that he had submitted to the court. (PJI Tr. 26; Ex. 10). Appellants' counsel responded by calling appellee's counsel, telling him that he had no settlement authority, and asking if the mediation could be rescheduled or canceled. (PJI Tr. 27). Appellants' counsel then filed a joint motion to continue the mediation. (PJI Tr. 27; Ex. 12). In a letter dated May 23, 2007, appellants' counsel responded to appellee's one million-dollar settlement demand by indicating that he had no authority to make a settlement offer. (PJI Tr. 30-31; Ex. 14).
 {¶ 99} The matter then proceeded to trial. During trial, appellants proposed a high/low agreement of $50,000/$500,000. (PJI Tr. 47). Appellee rejected this offer. (PJI Tr. 47). A day or two later, appellants offered appellee $100,000 to settle. (PJI Tr. 47). Appellee also rejected this offer. (PJI Tr. 47). This was the extent of all settlement talks.
 {¶ 100} From this evidence we cannot conclude that appellants made a good faith settlement offer. In fact, prior to trial, appellants made no settlement offer whatsoever. On more than one occasion, appellants' counsel told appellee's counsel that he had no authority to settle. And appellants decided not to attend a scheduled mediation because they were not going to settle.
 {¶ 101} Appellants point to the two settlement offers they made during trial as evidence of good faith efforts to settle. However, it does not seem that in-trial offers were the type contemplated by the Ohio Supreme Court: "The focus of an R.C. 1343.03(C) post-trial hearing for prejudgment interest must be the pretrial settlement efforts made between the plaintiffs and defendants and/or their insurers." (Emphasis added.) Moskovitz, 69 Ohio St.3d at 661.
 {¶ 102} And although it cannot be the only factor considered, a substantial disparity between an offer and a verdict is one factor that may be considered as demonstrating whether a party made a good-faith effort to settle. Andre v. Case Design, Inc., 154 Ohio App.3d 323,797 N.E.2d 132, 2003-Ohio-4960, at ¶ 15. Here the jury awarded appellee $750,000. Appellants' pretrial settlement offer was zero. *Page 20 
Even if we consider appellants' in-trial settlement offer of $100,000, this offer was nowhere near the amount that the jury awarded appellee.
 {¶ 103} Moreover, it does not appear that appellants rationally evaluated their potential risk and liability. Up until the day of trial, Dr. Slusher denied any negligence on his part. At his August 2006 deposition, Dr. Slusher stated that he did not misinterpret Cindy's mammograms and that nothing suspicious was apparent on the mammograms. Appellee's counsel later learned, however, that appellants had solicited the opinion of their own expert radiologist, Dr. Bowers. (PJI Tr. 28). In May 2006, Dr. Bowers informed appellants that suspicious calcifications were present in both sets of mammograms and believed they should have been mentioned. (PJI Tr. 28; Ex. 13). Yet Dr. Slusher continued to deny any deviation from the standard of care until the day of trial. Dr. Slusher stated that he changed his mind and determined that he should have noticed the microcalcifications on Cindy's mammogram after reviewing Dr. Homer's deposition during the week before trial. (Tr. 520-21).
 {¶ 104} But prior to Dr. Slusher's deposition, appellee provided appellants with a report from Dr. Ellen Mendelson, an expert in mammogram interpretation. (Tr. 523-25). In her report, Dr. Mendelson stated that she reviewed Cindy's mammograms and that in the 2001 mammogram, microcalcifications were present. (Tr. 525). At trial, Dr. Slusher admitted that the substance of Dr. Homer's opinions, which Dr. Slusher allegedly relied on in changing his mind that he misinterpreted the mammograms, was basically the same as Dr. Mendelson's report, which Dr. Slusher had prior to his deposition. (Tr. 528). Thus, Dr. Slusher's reason for admitting to his mistake in interpreting the mammograms seems disingenuous.
 {¶ 105} Appellants were also faced with the opinions of Drs. Homer and Chevlen. As discussed above, Dr. Homer testified that Cindy's 2001 mammogram clearly showed microcalcifications that required further testing and that her 2002 mammogram showed a density, which was the progression of untreated breast cancer. Dr. Homer further opined that at the time of the 2001 mammogram, the *Page 21 
cancer had not metastasized to Cindy's liver. Additionally, Dr. Chevlen testified that had Cindy's breast cancer been detected in 2001, there was a 97 percent chance that the cancer would have been confined only to her breast. (Tr. 365). He further testified that if Cindy's breast cancer had been detected in 2001, she would have had an 80 to 100 percent survival rate depending on the stage of the cancer. (Tr. 393-95).
 {¶ 106} At trial, appellant did have three experts opine that Dr. Slusher's negligence did not affect Cindy's ultimate outcome. Drs. Vogel, Connolly, and McMasters all testified that the cancer had to have been present in Cindy's liver in October 2001, when Dr. Slusher misinterpreted that mammogram. (Tr. 556-57, 644-49,715-19). However, Dr. Connolly and Vogel never reviewed Cindy's mammograms. (Tr. 564, 656). And Dr. McMasters had no opinion to offer on the mammograms because he is not an expert in mammogram interpretation. (Tr. 722).
 {¶ 107} Based on these reasons, the trial court did not abuse its discretion in finding that appellants failed to make a good faith settlement offer. Accordingly, appellants' fourth assignment of error is without merit.
 {¶ 108} For the reasons stated above, the trial court's judgment is hereby affirmed.
Waite, J., concurs.
 DeGenaro, P.J., concurs. *Page 1